IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION ATHLETIC GRANT-IN-AID CAP ANTITRUST LITIGATION | No.: 4:14-md-02541-CW No.: 4:14-cv-02758-CW |
| _____/ | ORDER GRANTING MOTION FOR RULE 23(b)(2) CLASS CERTIFICATION |
| MARTIN JENKINS et al., | |
| Plaintiffs, | |
| v. | |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION et al., | |
| Defendants. | |
| _____/ | |

Consolidated Plaintiffs and Jenkins Plaintiffs, current and former collegiate athletes, jointly move for certification of injunctive relief classes.  Defendants, the National Collegiate Athletic Association (NCAA) and a group of Division I conferences, oppose the motion.  After considering the parties' submissions, arguments at the hearing and supplemental filings, the Court GRANTS the joint motion for class certification.

BACKGROUND

Plaintiffs are student-athletes who played NCAA Division I Football Bowl Subdivision football[1] and men's and women's basketball between March 5, 2014 and the present.

_____

[1] The NCAA organizes member schools into Divisions I, II and III.  Division I football includes two subdivisions: the Football Bowl Subdivision (FBS) and the Football Championship Subdivision (FCS).

**United States District Court**
For the Northern District of California

Plaintiffs' challenges relate to NCAA restrictions on the compensation of student-athletes for their athletic performance. The NCAA sets a cap on the grant-in-aid (GIA) that student-athletes may receive.[2]  At the time these complaints were filed, the GIA was capped at the value of tuition, fees, room and board and required course books.  After Plaintiffs initiated this litigation, the NCAA permitted conferences to allow schools to compensate student-athletes with GIAs for up to their cost of attendance.

Consolidated Plaintiffs and Jenkins Plaintiffs allege in their complaints that the NCAA and its member institutions[3] violate federal antitrust law by conspiring to impose the cap on the amount of compensation a school may provide a student-athlete. Plaintiffs assert that, without the NCAA's cap on GIAs, schools would compete in recruiting student-athletes by providing more generous GIAs.  Plaintiffs seek an injunction against the GIA cap. Consolidated Plaintiffs seek, in addition to an injunction, damages for the difference between the GIAs awarded and the cost

---

[2] A grant-in-aid is a scholarship or form of financial aid that the NCAA does not consider "pay or the promise of pay for athletics skill" and that meets certain NCAA requirements.  See 2014-15 NCAA Manual at 57 (Bylaw 12.01.4); 189 (Bylaw 15.02.5).

[3] Jenkins Plaintiffs name as conference Defendants the Atlantic Coast Conference; the Big 12 Conference; the Big Ten Conference; the Pac-12 Conference; and the Southeastern Conference.  Consolidated Plaintiffs name all of those as well as the American Athletic Conference; Conference USA; the Mid-American Conference; the Mountain West Conference; the Sun Belt Conference; and the Western Athletic Conference.

of attendance.  They have not yet moved to certify a Rule 23(b)(3) class.[4]

This Court previously certified a class in <u>In re NCAA Student-Athlete Name & Likeness Licensing Litigation</u> (later titled, <u>O'Bannon v. National Collegiate Athletic Association</u>), 2013 WL 5979327 (N.D. Cal.).  That certification decision was not appealed.  After a bench trial, the Court ruled that the NCAA's restrictions on student-athletes receiving compensation for the use of their names, images and likenesses violated the Sherman Antitrust Act, and ordered injunctive relief.  <u>O'Bannon</u>, 7 F. Supp. 3d 955, 963 (N.D. Cal. 2014).  In <u>O'Bannon v. National Collegiate Athletic Association</u>, 802 F.3d 1049 (9th Cir. 2015), the Ninth Circuit affirmed this Court's ruling on the NCAA's violation of antitrust law and vacated part of this Court's injunctive remedy.  <u>See</u> <u>id.</u> at 1053.  On October 26, 2015, the Ninth Circuit directed the NCAA to file a response to the plaintiffs' petition for rehearing en banc.  <u>See</u> No. 14-16601, Docket No. 114.  The NCAA filed its response on November 16, 2015. <u>See</u> <u>id.</u>, Docket No. 115.

LEGAL STANDARD

Plaintiffs seeking to represent a class first must satisfy the threshold requirements of Rule 23(a).  Rule 23(a) provides that a case is appropriate for certification as a class action if:

> (1) the class is so numerous that joinder of all members is impracticable;

---

[4] Consolidated Plaintiffs indicated at the hearing that they no longer pursue a claim under California's Unfair Competition Act.  That claim is dismissed.

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

(2) there are questions of law or fact common to the class;
(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

Also, Plaintiffs must meet the requirements of one of the subsections of Rule 23(b).  In this motion, Plaintiffs seek certification under Rule 23(b)(2).  Rule 23(b)(2) applies where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."  Fed. R. Civ. P. 23(b)(2).

Plaintiffs seeking class certification bear the burden of demonstrating that they satisfy each Rule 23 requirement at issue. Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 158-61 (1982); Doninger v. Pac. Nw. Bell, Inc., 564 F.2d 1304, 1308 (9th Cir. 1977).  The court must conduct a "'rigorous analysis,'" which may require it "'to probe behind the pleadings before coming to rest on the certification question.'"  Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011) (quoting Falcon, 457 U.S. at 160-61).

DISCUSSION

Plaintiffs move to certify classes to seek injunctive relief against Defendants.  Consolidated Plaintiffs propose three classes:[5]

---

[5] As suggested by the Court at the hearing, Plaintiffs proposed revised class definitions for consistency between the two actions.  See Docket No. 291-1, Ex. 1.

Division I FBS Football Class: Any and all NCAA Division I Football Bowl Subdivision ("FBS") football players who, at any time from the date of the Complaint through the date of the final judgment, or the date of the resolution of any appeals therefrom, whichever is later, received or will receive a written offer for a full grant-in-aid as defined in NCAA Bylaw 15.02.5, or who received or will receive such a full grant-in-aid.

Division I Men's Basketball Class: Any and all NCAA Division I men's basketball players who, at any time from the date of the Complaint through the date of the final judgment, or the date of the resolution of any appeals therefrom, whichever is later, received or will receive a written offer for a full grant-in-aid as defined in NCAA Bylaw 15.02.5, or who received or will receive such a full grant-in-aid.

Division I Women's Basketball Class: Any and all NCAA Division I women's basketball players who, at any time from the date of the Complaint through the date of the final judgment, or the date of the resolution of any appeals therefrom, whichever is later, received or will receive a written offer for a full grant-in-aid as defined in NCAA Bylaw 02.5, or who received or will receive such a full grant-in-aid.

Docket No. 291-1, Ex. 1.  Jenkins Plaintiffs seek to represent two classes, identical to the first two of Consolidated Plaintiffs' proposed classes.  Id.

I.   Consolidated Plaintiffs' Class Representatives and Mootness

A student-athlete is eligible to participate in NCAA athletics and receive a GIA for a limited period of time. Defendants argue that the claims of Consolidated Plaintiffs' proposed class representatives are moot because they are no longer eligible to participate in NCAA athletics, precluding this Court from granting their motion for class certification.  Although their opposition brief alludes to "standing," Defendants clarified at the hearing and in their supplemental brief that they argue mootness at the time of class certification, not lack of standing at the time of

United States District Court
For the Northern District of California

filing the complaints.[6]  The Jenkins Plaintiffs' complaint
names representatives with claims that are not moot.
Although Consolidated Plaintiffs do not dispute that their
class representatives' claims are moot, the Court applies the
exception to mootness for inherently transitory claims.

Defendants are correct that, if "the plaintiff's claim
becomes moot before the district court certifies the class,
the class action normally also becomes moot." Slayman v.
FedEx Ground Package Sys., Inc., 765 F.3d 1033, 1048 (9th
Cir. 2014).

However, Plaintiffs argue that the "inherently
transitory" exception to mootness permits this Court to
certify the class even though Consolidated Plaintiffs'
representatives' claims are moot.  When this exception
applies, a court may "avoid[] the spectre of plaintiffs
filing lawsuit after lawsuit, only to see their claims mooted
before they can be resolved." Pitts v. Terrible Herbst,
Inc., 653 F.3d 1081, 1090 (9th Cir. 2011).  "'Some claims are
so inherently transitory that the trial court will not have
even enough time to rule on a motion for class certification
before the proposed representative's individual interest
expires.'" Id. (quoting Cnty. of Riverside v. McLaughlin,
500 U.S. 44, 52 (1991)) (brackets omitted); Haro v. Sebelius,

---

[6] Defendants suggest in a footnote that this Court cannot
certify a class if any members of the proposed classes are
ineligible to play NCAA athletics and, thus, lack standing.  But
because Defendants clarified at the hearing that they raise
mootness rather than standing issues, this argument is not
applicable.

1  747 F.3d 1099, 1110 (9th Cir. 2014).  Such a claim will

2  repeat as to the class because other persons similarly

3  situated will have the same complaint.  <u>Pitts</u>, 653 F.3d at

4  1090.

5      Defendants respond that Consolidated Plaintiffs'

6  interests are insufficiently "short-lived" to warrant

7  applying the exception because student-athletes have up to

8  four seasons of eligibility over the course of five years.

9  <u>See</u> 2014-15 NCAA Manual at 75.  Defendants continue that the

10 named Consolidated Plaintiffs knew of their eligibility

11 period and could have filed their complaints sooner than in

12 their final seasons of eligibility.  Consolidated Plaintiffs

13 counter that few student-athletes would be expected to bring

14 litigation against their school shortly after beginning their

15 first year on campus.  Further, some student-athletes receive

16 one-year GIAs.  Consolidated Plaintiffs have been diligent in

17 seeking class certification since they filed their

18 complaints.

19     The Court finds that, in the particular circumstances of

20 this case, Consolidated Plaintiffs' claims are transitory

21 enough that there was insufficient time to obtain a ruling on

22 the motion for class certification before the proposed

23 representatives' interests in injunctive relief expired.  <u>See</u>

24 <u>Pitts</u>, 653 F.3d at 1090; <u>Haro</u>, 747 F.3d at 1110.  The first

25 cases that eventually became part of this multidistrict

26 litigation were filed in California (<u>Alston v. Nat'l</u>

27 <u>Collegiate Athletic Ass'n</u>) and New Jersey (<u>Jenkins</u>) in March

28 2014.  A motion to transfer the then-pending actions was

United States District Court
For the Northern District of California

filed with the Judicial Panel on Multidistrict Litigation (JPMDL) later that month.  In April, John Bohannon, one of Consolidated Plaintiffs' proposed representatives, filed his complaint in Minnesota (Floyd et al. v. Nat'l Collegiate Athletic Ass'n); he was in his final year of NCAA eligibility.  Another case was filed in Louisiana in May.  The JPMDL issued orders transferring the cases to this district in June.  In July, all Plaintiffs except those in Jenkins filed a Consolidated Amended Complaint.  That month, another case was filed in this district and related to this case.  In August, another case was filed in Minnesota and transferred to this district by the JPMDL.  And another case was filed in this district and related to this case in November 2014.  In January 2015, Justine Hartman, Consolidated Plaintiffs' proposed women's basketball representative, filed her complaint in this district (Hartman et al. v. Nat'l Collegiate Athletic Ass'n); she also was in her final year of eligibility.  Her case was related to this case and her claims were incorporated into the Consolidated Amended Complaint in February.  Although this coordination and consolidation took time, it will, as the JPMDL found in its June 2014 transfer order, "eliminate duplicative discovery; prevent inconsistent pretrial rulings, including with respect to class certification; and conserve the resources of the parties, their counsel, and the judiciary." No. 14-md-02541-CW, Docket No. 1.

Meanwhile, in November 2014, Plaintiffs had filed a Joint Motion for Class Certification, which the Court

**United States District Court**
For the Northern District of California

indicated would be heard in February 2015.  In February 2015, the Court adopted a stipulation allowing Plaintiffs to file the Amended Joint Motion for Class Certification to account for new and substituted class representatives; the motion was noticed to be heard on May 14, 2015.  The class certification hearing was later delayed due to requests from both sides because of various issues, including weather, athletic schedules, attorneys' schedules and discovery.

Also contributing to this delay were recent changes in the law, which require consideration of the merits of a case on a class certification motion.  See Ellis v. Costco Wholesale Corp., 657 F.3d 970, 981 (9th Cir. 2011); Dukes, 131 S. Ct. at 2551-52.  These changes are resulting in a perceived need for more discovery and expert testimony before class certification than was the case in years past.  Here, Defendants submitted expert reports with their opposition to class certification.  The parties agreed that, if Plaintiffs filed expert reports with their reply, which they did, Defendants would be given additional time to depose Plaintiffs' experts and file a sur-reply.  Thus, the hearing was reset for October 1, 2015.

The complexity, pace and cutting edge nature of this multidistrict litigation affected the timing of this Court's class certification hearing and decision.  There is nothing to be gained by denying class certification only for class members to file a new lawsuit to be included in this litigation.  Accordingly, the Court finds that the inherently transitory exception to mootness applies to Consolidated

Plaintiffs' claims.  Consolidated Plaintiffs represent that they could add named Plaintiffs who are still eligible to receive GIAs.  In an abundance of caution, it might behoove them to move to do so.

II.  Class Certification and Rule 23(a) Requirements

Defendants do not dispute that Plaintiffs satisfy the requirements of Rule 23(a)(1), (2) and (3).  The Court addresses each requirement in turn.

A.   Rule 23 (a)(1): Numerosity

Plaintiffs assert, and Defendants do not dispute, that the proposed classes comprise thousands of potential members because of the numerous FBS football and Division I men's and women's basketball programs implicated and the numerous GIAs the NCAA permits each school to award.  Thus, Plaintiffs meet this requirement.  See In re Citric Acid Antitrust Litig., 1996 WL 655791, at *3 (N.D. Cal.).

B.   Rule 23(a)(2): Commonality

Plaintiffs identify several common questions regarding Defendants' alleged violations of federal antitrust law and the injunctive relief sought.  See In re NCAA Student-Athlete Name & Likeness Licensing Litig., 2013 WL 5979327, at *4 (N.D. Cal.) (class certification decision in case later titled, O'Bannon v. National Collegiate Athletic Association).  Such questions include the characteristics of the markets Plaintiffs identify in their complaints, "whether NCAA rules have harmed competition in those markets," and "whether the NCAA's procompetitive justifications for its

conduct are legitimate." See id. Thus, Plaintiffs sufficiently show commonality.

C.   Rule 23(a)(3): Typicality

"'[A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members.'" Falcon, 457 U.S. at 156 (quoting E. Tex. Motor Freight Sys., Inc. v. Rodriguez, 431 U.S. 395, 403 (1977)) (some quotation marks omitted). The purpose of the requirement is "to assure that the interest of the named representative aligns with the interests of the class." Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992). In the antitrust context, generally, "'typicality will be established by plaintiffs and all class members alleging the same antitrust violation by defendants.'" White v. Nat'l Collegiate Athletic Ass'n, 2006 WL 8066803, at *2 (C.D. Cal.) (quoting In re Rubber Chemicals Antitrust Litig., 232 F.R.D. 346, 351 (N.D. Cal. 2005)).

Here, named Consolidated Plaintiffs participated in NCAA Division I men's and women's basketball,[7] and named Jenkins Plaintiffs participate in FBS football and Division I men's basketball. All received or will receive full GIAs subject to NCAA Bylaws restricting the amount of such GIAs. Named

---

[7] Defendants do not dispute that a Division I men's basketball player may represent an FBS football player. Because the players challenge the same type of restriction in Division I men's basketball and FBS football, the Court finds that Consolidated Plaintiffs' representative—a Division I men's basketball player—may represent Consolidated Plaintiffs' proposed men's basketball and football classes.

United States District Court
For the Northern District of California

Plaintiffs assert that such NCAA restrictions constitute antitrust violations that lead to cognizable antitrust injuries.  Because all proposed class members share these asserted characteristics, claims and injuries, Plaintiffs satisfy Rule 23(a)(3).  See NCAA Student-Athlete Name & Likeness Licensing, 2013 WL 5979327, at *5; In re NCAA I-A Walk-On Football Players Litig., 2006 WL 1207915, at *6 (W.D. Wash.); White, 2006 WL 8066803, at *2.

D.   Rule 23(a)(4): Adequacy

Defendants claim that conflicts of interest among proposed class members preclude all named Plaintiffs from meeting Rule 23(a)(4)'s adequacy requirement.  Defendants present two theories that some proposed class members have interests in maintaining the challenged restrictions in conflict with those of named Plaintiffs: the "substitution effect" and the "economics of superstars."  To the extent either of Defendants' theories could be read to rely on potential harm to high school students, players who will not receive full GIAs or walk-on players who receive no compensation, the Court notes that the proposed class definitions do not include these individuals.  For the reasons discussed below, the Court finds that named Plaintiffs meet Rule 23(a)(4)'s adequacy requirement and that Defendants' theories for intra-class conflicts are without support.

"Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will

United States District Court
For the Northern District of California

the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" Hanlon v. Chrysler Corp., 150 F.3d 1011, 1020 (9th Cir. 1998). "'Only conflicts that are fundamental to the suit and that go to the heart of the litigation prevent a plaintiff from meeting the Rule 23(a)(4) adequacy requirement.'" In re Online DVD-Rental Antitrust Litig., 779 F.3d 934, 942 (9th Cir. 2015) (quoting 1 William B. Rubenstein et al., Newberg on Class Actions § 3.58 (5th ed. 2011)); see Amchem Products, Inc. v. Windsor, 521 U.S. 591, 625-27 (1997).

Defendants' "substitution effects" theory predicts the following chain of events: removing the GIA cap would lead to some student-athletes receiving greater compensation; greater compensation is an incentive for players to opt in to, or remain in, NCAA athletics who otherwise would have pursued more lucrative opportunities; that incentive would lead to more players competing for finite school resources; and that competition would result in less valued student-athlete class members losing their full GIAs.

Defendants also argue that an "economics of superstars" effect would occur absent the GIA cap. The relief Plaintiffs seek, goes Defendants' theory, would lead to a scenario in which "some players would receive a high level of compensation due to their high level of talent, but many more players would receive a much lower level of compensation, or none at all, and the overall income distribution would be highly skewed." Report of Defendants' Expert, Dr. James Ordover (Ordover Report) ¶ 48. According to Defendants,

United States District Court
For the Northern District of California

giving schools the freedom to compensate "superstar" or highly valued athletes above the GIA cap while continuing to accept—and possibly accepting more—walk-on players would lead to a wage distribution among student-athletes similar to that seen in professional leagues and would cause some members of the proposed classes to earn less than they earn with the current restrictions. See id. ¶¶ 45-68. Dr. Ordover opines that schools pay many players who currently receive full GIAs more than the incremental amount of revenue they produce for the school. He refers to this as paying these athletes more than their "marginal revenue product." He opines that if schools could compensate without a GIA cap, they would compensate these players at their lower marginal revenue product level. Id. ¶¶ 71-73.

> 1. Speculation as to the Relief Plaintiffs Seek

Defendants' theories for intra-class conflict assume that Plaintiffs seek an injunction that would create a completely unrestricted open market in which schools would compete to pay higher and higher amounts to a select few student-athletes without any requirements to provide a minimum number of full GIAs. In fact, although Plaintiffs challenge NCAA rules capping the GIA amount, they do not challenge existing rules—or Defendants' ability to enact new rules—setting minimum numbers of full GIAs.

It is speculative, not inevitable, that Defendants would change other NCAA rules or that the Court would order such an unrestrained market. Defendants could carry out alternatives, such as requiring a minimum number of full GIAs

**United States District Court**
For the Northern District of California

or requiring that schools not reduce or eliminate existing GIAs.[8]  If Defendants wanted to spread financial aid broadly and ensure the existing numbers of full GIAs, they could do so.  For instance, the NCAA currently, with limited exemptions, requires that FBS schools "[p]rovide an average of at least 90 percent of the permissible maximum number of overall football grants-in-aid per year during a rolling two-year period" and, each year, "offer a minimum of 200 athletics grants-in-aids or expend at least $4 million on grants-in-aid to student-athletes in athletics programs." 2014-15 NCAA Manual at 354.  Plaintiffs do not challenge this requirement.  Also, Plaintiffs' experts, Dr. Roger Noll and Dr. Edward Lazear, explain that any substitution effect is unlikely in the event that both the cap on GIA and the limit on the number of GIAs a school may award were removed.  See, e.g., Lazear Report ¶¶ 56, 61, 74; Noll Report at 5.

In speculating about intra-class conflicts, Defendants fail to recognize their own role in determining how compensation amounts would be set even if this Court were to enjoin the current GIA cap.  "[T]he mere potential for a conflict of interest is not sufficient to defeat class certification; the conflict must be actual, not

---

[8] Plaintiffs posit more possible alternatives: conferences, not schools, could pay athletes; schools could be required to provide all GIA recipients in one sport full cost of attendance before they could provide any other player in that sport more compensation; and schools could be required to pay each player on their teams the same amount.  See Report of Plaintiffs' Expert, Dr. Daniel Rascher (Rascher Report) ¶ 32.

hypothetical." <u>Berrien v. New Raintree Resorts Int'l, LLC</u>, 276 F.R.D. 355, 359 (N.D. Cal. 2011); <u>see</u> <u>Cummings v. Connell</u>, 316 F.3d 886, 896 (9th Cir. 2003) ("[T]his circuit does not favor denial of class certification on the basis of speculative conflicts.").[9]

Defendants also argue that due process concerns are raised by certifying a class to pursue an injunction that would disadvantage some unnamed members of the proposed classes.  Plaintiffs respond that, in an injunctive relief case such as this one, "divergent interests within the class militate in <u>favor</u> of certification—because certification gives affected parties a greater voice in the litigation." <u>Laumann v. National Hockey League</u>, 2015 WL 2330107, *10 (S.D.N.Y.).  Here, although the proposed class members may be competitors rather than consumers as in <u>Laumann</u>, they are thousands of student-athletes who, because they receive GIAs, are subject to the same challenged restraint.  A single student-athlete could sue to obtain an injunction against the GIA cap which would implicate all proposed class members'

---

[9] Nor is Defendants' reliance on <u>Walk-On Football Players</u> persuasive.  In that case, a putative class sought to eliminate a cap on the number of scholarships a school could award.  The class included a group of "Division I-A walk-ons . . . ." <u>Walk-On Football Players</u>, 2006 WL 1207915, at *2. The plaintiffs sought injunctive relief and money damages under Rule 23(b)(3).  <u>See</u> <u>id.</u>  The court concluded that the plaintiffs did not meet Rule 23(a)(4), reasoning that "to prove that he is entitled to a particular piece of the damages pie, each class member will have to offer proof that necessarily will involve arguing that a threshold number of other players (class members and non-class members) would <u>not</u> have gotten that same scholarship money." <u>Id.</u> at *8.  Here, however, Plaintiffs seek only injunctive relief aimed at the GIA cap on behalf of players who have received or will receive a full GIA.

16

interests.  In deciding whether to certify a (b)(2) class, the court considers that, in an individual case, "there is a real risk that the individual case will impact the absent parties' interests, with those parties being neither represented nor heard."  Rubenstein et al., Newberg on Class Actions § 4:34.  When the Rule 23 requirements are met, "Class certification helps the absent parties—it guarantees that their interests will be adequately represented, and it provides them notice and an opportunity to be heard about any settlement and/or attorney's fees request."  Id. (footnotes omitted).

Further, Plaintiffs contend that Defendants should not be heard to argue that class certification should be denied because some members of the proposed classes might be benefitted by, and thus prefer, continuation of antitrust violations.  See Probe v. State Teachers' Retirement System, 780 F.2d 776, 781 (9th Cir. 1986).  Defendants' response that there may be no antitrust violation begs the question.  Plaintiffs also argue that if competition among class members precluded certification of a class, then classes of employees could not be certified in employment cases and classes of sellers could not be certified in monopsony antitrust cases such as this one.  Such is not the case. See Meiresonne v. Marriott Corp., 124 F.R.D. 619, 625 (N.D. Ill. 1989).  In Laumann, the court recognized, "If the fact that illegal restraints operate to the economic advantage of certain class members were enough to defeat certification, the efficacy of classwide antitrust suits—and the deterrence function they serve— would wither."  2015 WL 2330107 at *10.  Here, although Defendants

17

United States District Court
For the Northern District of California

1  suggest that class members might prefer to leave an unlawful

2  restraint in place because they otherwise would have to compete

3  against one another, such preference for non-competition does not

4  justify denying injunctive relief class certification.

5          2. Expert Evidence and Intra-Class Conflicts

6          Defendants argue that Plaintiffs fail to provide expert

7  testimony of an economic model to analyze a scenario with a

8  hypothetical injunction and that this failure should preclude

9  certification.  Plaintiffs respond that their pleadings

10 sufficiently support class certification and that no expert

11 testimony is needed.  Because Defendants base their argument

12 regarding conflicts of interest on a form of relief that

13 Plaintiffs do not seek, the Court agrees with Plaintiffs that

14 economic modeling of a scenario with an injunction is

15 unnecessary to determine Rule 23(a)(4) adequacy in this case.

16         Nonetheless, Plaintiffs counter Defendants' economic

17 analyses from Dr. Ordover with their own expert reports from

18 Dr. Noll, Dr. Rascher and Dr. Lazear.

19         The Court finds that Dr. Ordover's reports fail to show

20 intra-class conflicts of interest because, even if Plaintiffs

21 sought the relief he assumes, his reports fail to demonstrate

22 that enjoining the GIA cap would induce additional players to

23 participate in NCAA athletics, and would induce schools, to

24 attract those additional players, to reduce or deny GIAs to

25 members of the proposed classes who receive full GIAs.  Nor

26 do they demonstrate that schools would change how they have

27 valued members of the proposed classes because of an

28 injunction against a GIA cap or that schools, despite their

United States District Court
For the Northern District of California

past actions and sources of revenue, would be forced by economic circumstances to harm certain members of the proposed classes.

### a. Substitution Effect

Dr. Ordover predicts that some members of the proposed classes will be harmed by any player compensation system that does not include the GIA cap.  So long as schools compensate some student-athletes at a higher level after an injunction than they did before, Dr. Ordover posits that "increases in the amount of athletics-based aid would naturally induce some people to accept or continue to receive such scholarships that otherwise would choose not to participate as FBS/D-I scholarship student-athletes."  Ordover Report ¶ 21.  He refers to these athletes as "additional players."  Id. Plaintiffs' expert, Dr. Noll, provides multiple persuasive reasons why current recipients of full GIAs would not be harmed if the GIA cap were lifted.  See Noll Report at 4-6.

With the cap, few athletes offered GIAs for FBS football or Division I basketball turn them down; ten percent of them did not join an FBS football program and five percent of them did not join a Division I men's basketball program between 2007 and 2011, according to Dr. Noll's report.  Id. at 15-16. And some who decline GIAs or who leave a school do so for non-financial reasons, such as health or academics.  Id. at 14-15.  In addition, among the athletes who turn down or give up GIAs, many have skill levels so low that they are unlikely to receive compensation offers large enough to prompt them to accept a scholarship absent the GIA cap.  See id. at 17.  As

Dr. Noll explains, "[N]early all athletes who plausibly decline or terminate scholarships for financial reasons are in the two lowest quality groups of high school players." Id. at 13, 16-17 (noting that "73 percent of those declining a DI men's basketball scholarship were rated as zero-star recruits" and that "80 percent of students who decline FBS offers are in the two lowest quality groups"). The Court finds that such additional individuals will not be induced to accept GIA offers and displace class members absent the cap, and, thus, will not create intra-class conflicts.

Dr. Ordover opines that players who declared themselves eligible to play in professional leagues, either in the United States or abroad, would potentially displace class members. Plaintiffs' expert, Dr. Lazear, explains that Dr. Ordover provides no evidence that college pay would rival that of the professional leagues, nor evidence regarding the role that "non-monetary considerations" play in deciding whether to attend college. Lazear Report ¶¶ 66, 69-70. Also, Dr. Lazear identifies "college basketball players in 2013 who entered the draft and did not make an NBA roster," and "football players in 2014 who entered the draft and did not get drafted," but finds only nineteen and forty-five such examples, respectively. Id. ¶ 66; see also Rascher Report ¶ 110.

Finally, Dr. Lazear challenges Dr. Ordover's prediction that the displaced players would be current full-GIA recipients rather than other student-athletes, such as "current partial GIA recipients, marginal high school

United States District Court
For the Northern District of California

athletes who would be the last to be given scholarships, and walk-ons who might have gotten a scholarship had additional players not chosen to stay." See Lazear Report ¶ 72. Dr. Ordover does not cite examples of schools rescinding scholarships to full GIA recipients. Although Dr. Ordover indicates that there are no national rules that protect a GIA recipient from losing a scholarship because of athletic performance, the NCAA could adopt such rules. The Court finds insufficient support to conclude that schools would rescind scholarships to class members absent the GIA cap, rather than displace non-class members.

In sum, Dr. Ordover identifies a potential group of athletes who might seek to displace members of the proposed classes absent the GIA cap, but fails to provide sufficient basis from which this Court can conclude that lifting the GIA cap for all student-athletes would induce this group to participate in NCAA athletics and schools to respond by withdrawing full GIAs from some class members so as to create intra-class conflicts.

                    b. Economics of Superstars

Because schools provide full GIAs to members of the proposed classes although they are not required to do so and because Plaintiffs do not oppose alternative NCAA rules regarding the distribution of GIAs, the Court finds insufficient basis in Dr. Ordover's reports for intra-class conflicts of interest arising from a hypothetical "economics of superstars." The Court does not find sufficient basis for his prediction that, absent the GIA cap, schools would pay

**United States District Court**
For the Northern District of California

some student-athletes on the basis of their lower marginal revenue product.

Based on his "economics of superstars" theory, Dr. Ordover predicts that roughly forty percent of FBS players and sixty percent of men's basketball players would receive a GIA valued at less than what they currently receive. See Ordover Report ¶¶ 57-61. Those percentages may be even higher, he adds, due to walk-on players who receive no compensation, the lack of collective bargaining in student athletics and the possibility that schools may offer fewer roster spots absent the GIA cap. See id. ¶¶ 62-68. To arrive at his percentages, he assumes that student-athletes would be compensated at an amount equal to fifty percent of their team's gross revenues, basing that assumption on an amicus brief filed by economists and professors of sports management in support of the plaintiffs in O'Bannon. Id. ¶¶ 57-61. Dr. Ordover states that he is unaware of any support for the claim by these economists, but he uses that assumption and divides the teams' gross revenues by the limit on the number of full GIAs a school may award—eighty-five in FBS football and thirteen in men's basketball—to estimate an amount that would be paid to players. Id. Then, he assumes that salaries would be distributed among student-athletes in a way similar to that among professional athletes. Id. ¶¶ 60-61. Also, Dr. Ordover hypothesizes that without the GIA cap schools would pay student-athletes only their marginal revenue product and that this amount in some cases would be less than a full GIA.

United States District Court
For the Northern District of California

Dr. Lazear raises a serious concern with Dr. Ordover's predictions, however, by explaining that they cannot account for schools' "revealed preference"—making a choice repeatedly over time reveals that the benefits of the choice exceed the costs. Lazear Report ¶ 79. Members of the proposed classes have received or will receive full GIAs. "[T]hat a college has already chosen to award a student athlete a GIA means that the benefit, broadly defined, from doing that must exceed the cost to the college, at least in expectation." Id. Dr. Ordover responds that "revealed preference" under the GIA cap does not necessarily predict schools' preference absent the GIA cap. See Ordover Reply ¶¶ 19-20. Dr. Ordover predicts "a regime change in the way student-athletes are evaluated and awarded financial aid" absent the GIA cap because schools would base player compensation on the player's "expected value" and "have stronger incentives to more closely align compensation to the player's 'value.'" Id. ¶ 22. Still, Dr. Ordover does not explain why schools today provide full GIAs to purportedly overvalued class members without being required to do so and would stop doing so absent the GIA cap.

Even assuming that Dr. Ordover's marginal revenue product estimates are accurate and that some are below the current GIA cap, Dr. Noll points out, "The fact that nearly all scholarship athletes have been paid the GIA cap for decades, notwithstanding that colleges do not need to use all of their scholarships or to pay athletes as much as the NCAA rules allow, supports the conclusion that the [marginal

revenue products] of these players are not less than the GIA cap." Noll Report at 27; 29-30. And Dr. Noll explains that marginal revenue product values reflect a student-athlete's performance after a season concludes, but relevant here is how a school values a student-athlete before the student-athlete performs. See id. at 27-28. "Expected marginal revenue product" is "almost certain to diverge from the actual [marginal revenue product] of an athlete in any specific year because initial expectations about an athlete's contribution to the team are unlikely to be perfect . . . ." Id.

In sum, Dr. Ordover's "economics of superstars" prediction lacks sufficient support to demonstrate intra-class conflicts of interest.

Both the "substitution effect" and "economics of superstars" theories also depend on the assumption that schools could not afford to spend more money compensating all student-athletes rather than cutting payments to some. That assumption is also not supported, as discussed in the next section.

c. NCAA Financial Data on Athletic Departments

Defendants predict that an injunction would increase the costs to schools of participating in FBS and Division I athletics and, in turn, schools would stop participating in FBS and Division I athletics or take steps to lower their costs, such as offering fewer GIAs. Yet again, Plaintiffs do not seek an unrestricted market for player compensation.

United States District Court
For the Northern District of California

Defendants would maintain a role in determining how compensation would be set without the current GIA cap.

Further, Defendants assume that any increase in student-athlete compensation resulting from an injunction would force schools to offset such cost by disadvantaging some members of the proposed classes.  The Court finds insufficient basis for such an assumption, because of schools' past behavior and alternative available sources of funds.  Dr. Ordover posits that, according to NCAA data, "most athletic departments, many FBS football and Division I men's basketball programs, and all Division I women's basketball programs have consistently higher expenses than revenues."  Ordover Report ¶ 75.  He predicts harm to some class members to the extent that an injunction leads to any increase in costs.  Id.

Plaintiffs' experts challenge Dr. Ordover's conclusions. For instance, Dr. Noll notes that, recently, "revenues from college sports at FBS institutions have grown far more rapidly than the rate of increase in the value of an athletic scholarship."  Noll Report at 24.  "The growth in revenues from college sports has been used to increase expenditures in football and men's basketball, especially on the salaries of coaches and administrators, recruiting activities, and facilities for those sports."  Id.  Similarly, Dr. Lazear asserts that Dr. Ordover's revenue analysis fails to account for alternative sources of funds to compensate student-athletes and does not consider that colleges allocate funds to departments on the basis of more criteria than simply

revenue generation.  See Lazear Report ¶¶ 122-38.  Other

sources of funds include:

> (1) redirections from other school expenditures (not
> necessarily sports), (2) changes in additions to or
> subtractions from the endowment, (3) increased alumni
> donations specifically made to cover athlete salaries
> . . . , (4) reductions in spending on other factors that
> are complements with players, such as spending on
> coach's salaries or on facilities (athletic or other).

Id. ¶ 129; see Noll Report at 23-25; Rascher Report ¶¶ 82-

97.  Also, according to Dr. Lazear, "with the exception of

the PAC-12, revenues grew 4 percent to 7 percent for public

schools in the power conferences between 2013 and 2014."

Lazear Report ¶ 124.  That other schools "continue to invest

in their sports programs even when net revenues are negative

means that schools value the programs at least as much as

the amount they spend on them."  Id. ¶ 133.

Dr. Ordover responds that not all schools are

benefitting from revenue increases and that "some incremental

deterioration in the financial position of athletics

departments will cause some schools to reevaluate their

participation in FBS/D-I athletics."  Ordover Reply Report

¶¶ 52-54.  Dr. Rascher notes that, after schools recently

were allowed to pay up to cost of attendance, "no Division I

school announced a unilateral reduction in GIA offers, and

. . . no school reduced its offers to some

football/basketball athletes in order to fund the increase to

other athletes."  Rascher Report ¶¶ 77-78; see also O'Bannon,

7 F. Supp. 3d at 982 (finding, on the basis of evidence

relating to NCAA revenues, that "schools would not exit FBS

football and Division I basketball if they were permitted to

**United States District Court**
For the Northern District of California

pay their student-athletes a limited amount of compensation beyond the value of their scholarships").

Accordingly, Plaintiffs persuasively demonstrate that Dr. Ordover's bases for predicting that schools would be forced by budgetary constraints to make decisions leading to intra-class conflicts are flawed.

Defendants lack sufficient support to show intra-class conflicts arising from their "substitution effects" and "economics of superstars" theories. Plaintiffs meet Rule 23(a)(4)'s requirements. In addition, the Court finds that counsel is experienced in class action litigation and litigation on behalf of athletes, a point that Defendants do not dispute.

In sum, Plaintiffs satisfy Rule 23(a).

III. Rule 23(b)(2) Requirements

The Ninth Circuit has explained that the Rule 23(b)(2) requirements as stated in Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2557 (2011), "are unquestionably satisfied when members of a putative class seek uniform injunctive or declaratory relief from policies or practices that are generally applicable to the class as a whole." Parsons v. Ryan, 754 F.3d 657, 688 (9th Cir. 2014) (citing Rodriguez v. Hayes, 591 F.3d 1105, 1125 (9th Cir. 2010)). "That inquiry does not require an examination of the viability or bases of the class members' claims for relief, does not require that the issues common to the class satisfy a Rule 23(b)(3)-like predominance test, and does not require a finding that all members of the class have suffered identical injuries." Id.

**United States District Court**
For the Northern District of California

1   (footnote omitted).  "Rather, as the text of the rule makes

2   clear, this inquiry asks only whether 'the party opposing the

3   class has acted or refused to act on grounds that apply

4   generally to the class.'"  Id. (quoting Fed. R. Civ. P.

5   23(b)(2)).

6       Here, Defendants argue that the purported intra-class

7   conflicts discussed above also make injunctive relief

8   inappropriate.  As discussed above, the Court finds no such

9   conflicts.  Plaintiffs allege that all members of the

10  proposed classes suffer antitrust harms by being

11  undercompensated for the services they offer as student-

12  athletes.  The NCAA's GIA cap applies generally to the class

13  by precluding schools from paying any class member more than

14  the cap.  Plaintiffs seek to enjoin the cap on GIAs—an

15  injunction that would apply to all class members by

16  permitting schools to compensate them independent of the GIA

17  cap.  See id. at 689 (noting that "every [plaintiff] in the

18  proposed class is allegedly suffering the same (or at least a

19  similar) injury and that injury can be alleviated for every

20  class member by uniform changes in . . . policy and

21  practice").  Thus, Plaintiffs satisfy Rule 23(b)(2).

22      IV.  Request to Dismiss Jenkins as Duplicative

23      Defendants argue that, rather than certify the Jenkins

24  classes, the Court should simply dismiss the Jenkins case

25  because it was later-filed, names fewer Defendants, and

26  proposes classes encompassed by, but more limited than,

27  Consolidated Plaintiffs' proposed classes.  Plaintiffs

28  characterize this suggestion as untimely, given that this

Court previously denied a motion to dismiss the complaints. See Docket No. 131. Although Defendants argue that the request for certification of identical classes in two cases creates new grounds for dismissal, they cite no authority requiring dismissal.

Defendants cite cases involving the "first-to-file" rule, but these cases fail to provide grounds for dismissing Jenkins Plaintiffs' action. "There is a generally recognized doctrine of federal comity which permits a district court to decline jurisdiction over an action when a complaint involving the same parties and issues has already been filed in another district." Pacesetter Sys., Inc. v. Medtronic, Inc., 678 F.2d 93, 94-95 (9th Cir. 1982). The court in which the second action was filed may "transfer, stay, or dismiss" that action. Alltrade, Inc. v. Uniweld Products, Inc., 946 F.2d 622, 623 (9th Cir. 1991).

Congress created a procedural tool for use when similar cases are filed in multiple districts—a transfer by the JPMDL. See 28 U.S.C. § 1407. That panel has already addressed these cases and decided to transfer them to this Court for pretrial proceedings, which include class certification motions. This Court may not transfer a multidistrict litigation case to itself for trial. See Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26, 28, 40 (1998). Jenkins Plaintiffs repeatedly have asserted their right to a remand to the District of New Jersey for trial. Under these circumstances, to dismiss a

transferred case rather than remanding it would subvert the multidistrict litigation process.

In support of their opposition to certification of the Jenkins classes, Defendants also cite the potential for duplicative discovery and duplicative work by counsel that could affect a later motion for attorneys' fees. Consolidated Plaintiffs and Jenkins Plaintiffs alleviate concerns regarding duplication by requesting that lead counsel for each serve as co-lead counsel for all injunctive relief classes, agreeing to serve joint discovery requests and expert reports. Concerns about duplicative work by counsel may be raised in opposition to any attorneys' fees motions. Duplication at trial can be mitigated by staying one action while the other proceeds to trial. The first ruling may create a collateral estoppel or res judicata effect. If Consolidated Plaintiffs successfully move for certification of a Rule 23(b)(3) damages class, Plaintiffs propose to seek to stay the Jenkins action pending completion of a trial by jury in this district by co-lead counsel. If Consolidated Plaintiffs do not succeed in such a motion, Plaintiffs have committed to seek to stay either the consolidated case or the Jenkins case prior to trial of the other.

Defendants also claim that certification of Consolidated Plaintiffs' and Jenkins Plaintiffs' proposed classes would deprive them of their Seventh Amendment rights if injunctive relief claims were resolved before damages claims. Seventh Amendment rights can be protected by trying the complaint

30

**United States District Court**
For the Northern District of California

1    seeking damages first or by declining to apply non-mutual

2    offensive collateral estoppel.

3         The Court finds no reason to deny certification of all

4    classes, or to dismiss Jenkins Plaintiffs' action.

5                            CONCLUSION

6         For the reasons above, this Court GRANTS Plaintiffs'

7    amended joint motion for class certification (Docket No.

8    200).  The Court certifies each class defined above.

9         The Court appoints lead counsel for Consolidated

10   Plaintiffs (Habens Berman Sobol Shapiro LLP and Pearson,

11   Simon, & Warshaw LLP) and lead counsel for Jenkins Plaintiffs

12   (Winston & Strawn LLP) as co-lead counsel for the Rule

13   23(b)(2) injunctive relief classes in both cases.

14        The Court DISMISSES Consolidated Plaintiffs' claim under

15   California's Unfair Competition Act.

16        IT IS SO ORDERED.

17

18   Dated: December 4, 2015           _____
                                       CLAUDIA WILKEN
19                                     United States District Judge

20

21

22

23

24

25

26

27

28