Steve W. Berman (*pro hac vice*)
Ashley Bede (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
*steve@hbsslaw.com*
*ashleyb@hbsslaw.com*

Bruce L. Simon (96241)
Aaron M. Sheanin (214472)
Benjamin E. Shiftan (265767)
PEARSON, SIMON & WARSHAW, LLP
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
Telephone:  (415) 433-9000
Facsimile:  (415) 433-9008
*bsimon@pswlaw.com*
*asheanin@pswlaw.com*
*bshiftan@pswlaw.com*

*Class Counsel for Jenkins and Consolidated Action Plaintiffs*

[Additional counsel listed on signature page]

Jeffrey L. Kessler (*pro hac vice*)
David G. Feher (*pro hac vice*)
David L. Greenspan (*pro hac vice*)
Joseph A. Litman (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
*jkessler@winston.com*
*dfeher@winston.com*
*dgreenspan@winston.com*
*jlitman@winston.com*

Sean D. Meenan (SBN 260466)
Jeanifer E. Parsigian (SBN 289001)
WINSTON & STRAWN LLP
101 California Street
San Francisco, CA 94111
Telephone: (415) 591-1000
Facsimile: (415) 591-1400
*smeenan@winston.com*
*jparsigian@winston.com*

*Class Counsel for Jenkins and Consolidated Action Plaintiffs*

[Additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| IN RE: NATIONAL COLLEGIATE ATHLETIC ASSOCIATION ATHLETIC GRANT-IN-AID CAP ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | Case No. 4:14-md-02541-CW (NC)<br>Case No. 4:14-cv-02758-CW (NC)<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION TO COMPEL RE FINANCIAL DOCUMENTS, BROADCAST, MEDIA, AND SPONSORSHIP CONTRACTS, AND MARKETING DOCUMENTS**<br><br>Date:          August 11, 2016<br>Time:          2:00 p.m.<br>Courtroom:   Courtroom 7, 4th floor<br>Magistrate   Judge Nathanael M. Cousins |

**NOTICE OF MOTION**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on August 11, 2016, at 2:00 p.m., at the courtroom of Magistrate Judge Nathaniel M. Cousins, Courtroom 7, 4th Floor, United States District Court, 280 South 1st Street, San Jose, California, Consolidated Plaintiffs will and hereby do move the Court, pursuant to Federal Rule of Civil Procedure 37(a)(3)(B)(iv), for an order compelling production of financial documents, broadcast, media and similar sponsorship contracts, and marketing materials currently in the possession of the Atlantic Coast Conference, the Big Ten Conference, the Big Twelve Conference and the Pac-12 Conference (collectively the "Conference Defendants").  Each document is a business record of each Conference Defendant, which each Conference Defendant currently maintains.

This is supported by (i) this notice of motion and motion; (ii) the accompanying memorandum of points and authorities in support thereof; (iii) the accompanying Declaration of Declaration of Jeanifer E. Parsigian and attached exhibits; (iv) the files and records in this matter; and (v) oral argument.

Dated:  June 10, 2016

Respectfully submitted,

By ____/s/ Steve W. Berman_____
    Steve W. Berman (*pro hac vice*)
    Ashley Bede (*pro hac vice*)
    HAGENS BERMAN SOBOL SHAPIRO LLP
    1918 Eighth Avenue, Suite 3300
    Seattle, WA 98101
    Telephone: (206) 623-7292
    Facsimile:  (206) 623-0594
    *steve@hbsslaw.com*
    *ashleyb@hbsslaw.com*

    Jeff D. Friedman (173886)
    HAGENS BERMAN SOBOL SHAPIRO LLP
    715 Hearst Avenue, Suite 202
    Berkeley, CA 94710
    Telephone: (510) 725-3000
    Facsimile: (510) 725-3001
    *jefff@hbsslaw.com*

By /s/ Bruce L. Simon_____
    Bruce L. Simon (96241)
    Aaron M. Sheanin (214472)
    Benjamin E. Shiftan (265767)
    PEARSON, SIMON & WARSHAW, LLP
    44 Montgomery Street, Suite 2450
    San Francisco, CA 94104
    Telephone:  (415) 433-9000
    Facsimile:   (415) 433-9008
    *bsimon@pswlaw.com*
    *asheanin@pswlaw.com*
    *bshiftan@pswlaw.com*

    *Class Counsel for Jenkins and Consolidated*
    *Action Plaintiffs*

    Elizabeth C. Pritzker (146267)
    Jonathan K. Levine (220289)
    Bethany L. Caracuzzo (190687)
    Shiho Yamamoto (264741)
    PRITZKER LEVINE LLP
    180 Grand Avenue, Suite 1390
    Oakland, California 94612
    Telephone:  (415) 692-0772
    Facsimile:   (415) 366-6110

    *Additional Class Counsel*

By ____/s/ Jeffrey L. Kessler_____
    Jeffrey L. Kessler (*pro hac vice*)
    David G. Feher (*pro hac vice*)
    David L. Greenspan (*pro hac vice*)
    Jennifer M. Stewart (*pro hac vice*)
    Joseph A. Litman (*pro hac vice*)
    WINSTON & STRAWN LLP
    200 Park Avenue
    New York, NY 10166-4193
    Telephone: (212) 294-6700
    Facsimile: (212) 294-4700
    *jkessler@winston.com*
    *dfeher@winston.com*
    *dgreenspan@winston.com*
    *jstewart@winston.com*
    *jlitman@winston.com*

    Sean D. Meenan (SBN 260466)
    Jeanifer E. Parsigian (SBN 289001)
    WINSTON & STRAWN LLP
    101 California Street
    San Francisco, CA 94111
    Telephone: (415) 591-1000
    Facsimile: (415) 591-1400
    *smeenan@winston.com*
    *jparsigian@winston.com*

    *Class Counsel for Jenkins and*
    *Consolidated Action Plaintiffs*

2

# TABLE OF CONTENTS

Page(s)

I.   PRELIMINARY STATEMENT ................................................................................. 1

II.  BACKGROUND .................................................................................................... 2

    A.   Claimed Defenses, Pro-Competitive Justifications, and Arguments Relating to the Requested Documents ........................................................ 2

    B.   The Specific Documents At Issue ........................................................... 6

        1.   Media Contracts ............................................................................ 7

        2.   Sponsorship Contracts .................................................................. 8

        3.   Negotiation Documents ................................................................ 8

        4.   Financial Statements ..................................................................... 9

        5.   Projections .................................................................................... 9

        6.   Financial Analyses ........................................................................ 9

        7.   Marketing Documents ................................................................. 10

IV.  ARGUMENT ....................................................................................................... 11

    A.   Legal Standard ...................................................................................... 11

    B.   The Requested Documents Should Be Produced .................................. 11

        1.   Contracts .................................................................................... 11

        2.   Negotiation Documents .............................................................. 13

        3.   Financial Statements ................................................................... 13

        4.   Projections & Financial Analyses ............................................... 14

        5.   Marketing Documents ................................................................. 14

    C.   There Are No Legitimate Confidentiality Concerns to Prevent the Production of These Documents ............................................................ 15

V.   CONCLUSION ..................................................................................................... 18

i

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO COMPEL FINANCIAL DOCUMENTS, BROADCAST, MEDIA, AND SPONSORSHIP CONTRACTS, AND MARKETING DOCUMENTS- CASE NOS. 4:14-MD-02541-CW; 4:14-CV-02758-CW

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*Antman v. Uber Technologies, Inc.*,
   2016 WL 164294 (N.D. Cal. Jan. 14, 2016) ...................................................................16

*Apple Inc. v. Samsung Electronics Co. Ltd.*,
   No. C 11-1846 LHK PSG, 2012 WL 2862613 (N.D. Cal. July 11, 2012) .............................16, 17

*ASUS Computer Int'l v. Round Rock Research, LLC*,
   2013 WL 6113253 (N.D. Cal. Nov. 20, 2013) ...................................................................15

*Blankenship v. Hearst Corp.*,
   519 F.2d 418 (9th Cir. 1975) ...................................................................................11

*Goes Int'l, AB v. Dodur Ltd.*,
   2016 WL 427369 (N.D. Cal. Feb. 4, 2016) .......................................................................11

*Hatamian v. Advanced Micro Devices, Inc.*,
   2015 WL 7180662 (N.D. Cal. Nov. 16, 2015) ...................................................................11

*Holman v. Experian Info. Solutions, Inc.*,
   2012 WL 2501085 (N.D. Cal. June 27, 2012) ...................................................................17

*Live Nation Merch. v. Miller*,
   2014 WL 1877912 (N.D. Cal. May 9, 2014) .....................................................................15

*Nazomi Communications, Inc. v. Arm Holdings PLC*,
   2002 WL 32831822 (N.D. Cal. Oct.  11, 2002).................................................................17

*In re NCAA Student-Athlete Name Likeness Licensing Litig.*,
   No. 09-1967 CW (N.D. Cal. Feb. 8, 2012), ECF No. 62 .........................................................16

*Pasadena Oil & Gas Wyoming LLC v. Montana Oil Properties Inc.*,
   320 Fed. App'x 675 (9th Cir. 2009) .............................................................................15

*Thompson v. C&H Sugar Co., Inc.*,
   2014 WL 595911 (N.D. Cal. Feb. 14, 2014) ...................................................................16

**Other Authorities**

Fed. R. Civ. P. 26(b)(1)........................................................................................11

Fed. R. Civ. P. 34(a)(1)........................................................................................11

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ii

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO COMPEL FINANCIAL DOCUMENTS, BROADCAST, MEDIA, AND
SPONSORSHIP CONTRACTS, AND MARKETING DOCUMENTS- CASE NOS. 4:14-MD-02541-CW; 4:14-CV-02758-CW

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.      PRELIMINARY STATEMENT**

This motion to compel concerns the Conference Defendants' continuing refusal to produce documents that are directly relevant to their *own* asserted defenses and procompetitive justifications —in particular, claims of adverse financial consequences if current rules restricting athlete compensation are declared illegal, claims that the current restrictions are needed to ensure consumer interest in college football and basketball, and claims that the current restrictions are necessary to protect student welfare relating to "integration" of athletes with other students.  Yet, at the same time the Conference Defendants are making these arguments, they seek to deprive Plaintiffs of financial, marketing, and related documents that bear directly on these issues.  These refusals cannot be justified and the Court should order the documents to be produced.

Since Plaintiffs initially filed their motion to compel earlier this year, Plaintiffs have showed a continuing willingness to narrow and focus their requests to address practical concerns raised by certain of the conferences.  Indeed, Plaintiffs and the Southeastern Conference ("SEC") reached a comprehensive agreement on all of these discovery issues apart from limited matters that remain to be resolved, consistent with the Stipulation filed by Plaintiffs and the SEC that has been approved by the Court (ECF No. 388).

However, two of the conferences—the Big Ten and the Atlantic Coast Conference ("ACC")—have declined to enter into *any* further meet and confer discussions with Plaintiffs regarding any of these issues since the filing of the initial motion to compel (ECF No. 311), despite Plaintiffs' repeated invitations to engage in such negotiations.  This intransigence is in contrast to the negotiations that Plaintiffs had with the SEC, which substantially narrowed the issues for the Court to decide and resulted in the SEC's agreement to produce the vast majority of the documents requested.  It also is in contrast to the continuing negotiations with the Pac-12 and the Big 12 that, while not yet complete, likely will also significantly narrow the issues for the Court to decide regarding these documents.  However, given the positions of the Big Ten and the ACC, and the presence of the remaining issues with the other conferences, Plaintiffs are left with no choice but to

1

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO COMPEL FINANCIAL DOCUMENTS, BROADCAST, MEDIA, AND SPONSORSHIP CONTRACTS, AND MARKETING DOCUMENTS- CASE NOS. 4:14-MD-02541-CW; 4:14-CV-02758-CW

1    bring these issues to the Court for resolution so that they are not deprived of highly relevant
2    documents regarding claimed defenses that are at the core of this case.

3    II.    **BACKGROUND**

4           A.    **Claimed Defenses, Pro-Competitive Justifications, and Arguments Relating to
5                 the Requested Documents**

6           Plaintiffs are seeking the documents at issue here because the Conference Defendants are
7    grounding their defenses on arguments relating to financial, consumer interest, and student welfare
8    issues.  The documents sought bear directly on whether these arguments withstand serious scrutiny.

9           To begin with, the Conference Defendants have claimed that their restrictions on athlete
10   compensation should be upheld because otherwise they will face financial ruin or other adverse
11   financial consequences, including otherwise having to reduce scholarships to students in other
12   sports, cut back on athletic program offerings, and facing reduced support from contributors and
13   governments:

15          "Most Division I institutions face serious financial constraints and, if plaintiffs
16          succeed in eliminating the challenged rules, those constraints would likely lead
            many—if not most—Division I institutions to reduce athletic scholarships for some
17          putative class members even as some institutions increase scholarships for
            others."  Defendants' Opposition to Plaintiffs' Amended Joint Motion For Class
18          Certification at 14, ECF No. 216.

19          "The challenged rules serve the procompetitive goal of widening opportunities for
20          student-athletes to attend college through athletic scholarships in all sports in a
            manner compliant with Title IX and related regulatory requirements, thereby
21          expanding output in the college education market."  Defendant ACC's Amended and
            Supplemental Responses and Objections to Interrogatory No. 5 at 7 (May 13, 2016).[1]

22          "Most Division I athletics departments operate at a financial deficit.  College athletics
23          programs generally produce less revenue than they require to operate.  Even when
            examined separately, most FBS football programs, most Division I men's basketball
24          programs and all Division I women's basketball programs operate at deficits.  The
            requested injunction would exacerbate these deficits, intensify the bidding wars for
25          the most talented student-athletes and likely cause some schools to reevaluate the

26   ───────────────────────
     [1] The ACC, Big Ten, Big 12, and Pac-12 provided identical lists of potential procompetitive
27   justifications in response to Plaintiffs' Interrogatory No. 5, which are attached as Exhibits 1-4 to the
     concurrently filed Declaration of Jeanifer E. Parsigian ("Parsigian Decl."), as did the NCAA and
28   other conferences.  For simplicity, Plaintiffs will provide the pincite to Defendant ACC's Amended
     and Supplemental Responses and Objections to Interrogatory No. 5.

wisdom of continuing to offer FBS football or Division I basketball programs." Defendants' Opposition to Plaintiffs' Amended Joint Motion For Class Certification at 14-15, ECF No. 216(internal citations omitted).

"[T]he challenged NCAA rules are designed both (i) to preserve the amateur student-athlete collegiate model and (ii) to encourage colleges and universities to spread their athletics-based financial aid among a large number of student-athletes, rather than concentrate their spending on the recruitment of a handful of superstar players. These rules ensure that more student-athletes are able to afford a college education and to participate in Football Bowl Subdivision ("FBS") football, Division I men's and women's basketball, and a broad array of non-revenue sports programs." Defendants' Sur-Reply Memorandum and Points and Authorities in Opposition of Plaintiffs' Amended Joint Motion for Class Certification at 3, ECF No. 238.

"If, in the face of these constraints, some putative class members would receive compensation in the but-for world that exceeds the value of the grants-in-aid they currently receive, these constraints likely would preclude across-the-board increases in financial aid for all putative class members at all institutions, and likely will lead to reductions in, or possibly complete elimination of, the athletics-based financial aid currently provided to many other putative class members." Defendants' Opposition to Plaintiffs' Amended Joint Motion for Class Certification, Expert Report of Janusz A. Ordover, Ph.D., at 53, ECF No. 216-2.

"The available data indicates that, contrary to Plaintiffs' claims, the athletic departments at most schools are neither 'lucrative' nor 'flush with cash.' Instead, most athletic departments, many FBS football and Division I men's basketball programs, and all Division I women's basketball programs have consistently higher expenses than revenues. While most institutions continue to sponsor Division I athletics teams despite experiencing persistent operating deficits, a large increase in expenses could put some of them over a level of deficit that would cause them to re-evaluate their commitment to Division I athletics." *Id.* at 54 (emphasis removed).

"The challenged rules serve the procompetitive goal[] of . . . improving the quality of college education by providing a broader scope of athletic program offerings in which student athletes can participate, compete, and gain exposure as team members in intercollegiate competition and in which other students, alumni, and other supporters of college athletics can be involved and participate as fans." Defendant ACC's Amended and Supplemental Responses and Objections to Interrogatory No. 5 at 8.

"The challenged rules serve the procompetitive goal of promoting support for colleges and universities from alumni, government bodies, and other supporters." *Id.* at 7.

The conferences have also argued that keeping these sports "amateur" is necessary to expand output and maximize consumer demand for these sports, which similarly puts at issue the conferences' finances and the finances of these sports:

1

2          "The challenged rules serve the procompetitive goals of expanding output in the
           college education market and improving the quality of the collegiate experience for
3          student-athletes, other students, and alumni by maintaining the unique heritage and
           traditions of college athletics and preserving amateurism as a foundational principle,
4          thereby distinguishing amateur college athletics from professional sports, allowing
           the former to exist as a distinct form of athletic rivalry as an essential component of a
5          comprehensive college education." Defendant ACC's Amended and Supplemental
           Responses and Objections to Interrogatory No. 5 at 7.

6          "The challenged rules serve the procompetitive goal[] of promoting consumer
7          demand in the college education market . . . ." *Id.* at 8.

8          "In [O'Bannon, the Northern District of California] held that appropriate limits on
           the amount of compensation that student-athletes may receive while in school are
9          lawful under Section 1 because they serve the procompetitive goal[] of (i)
           maximizing consumer demand for amateur student-athlete intercollegiate sports. . . ."
10         Defendants' Memorandum of Points and Authorities in Support of Motion to Dismiss
           the Complaints at 1, ECF No. 89.
11

12         "[T]his court has already held that the legitimate procompetitive goal[] of maximizing
           consumer demand for the NCAA's product of intercollegiate amateur sports . . . are
13         furthered by appropriate limits on student-athlete compensation." *Id.* at 6.

14         "Yet, plaintiffs ignore this Court's conclusion that the NCAA's legitimate
15         procompetitive goal[] of maximizing consumer demand for intercollegiate amateur
           sports . . . justif[ies] certain limits on compensation to student athletes."  Reply
16         Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss
           the Complaints at 9, ECF No. 100.
17

18          "[T]he challenged NCAA rules limiting the amount of compensation that student-
           athletes could be paid while in school yield some limited procompetitive benefits by
19         marginally increasing consumer demand for the NCAA's product . . . ." Answer and
           Affirmative Defenses of Defendant Pac-12 Conference to Plaintiffs' Second
20         Amended Complaint at 19, ECF No. 203 (internal citations and quotation marks
           omitted).
21

22         "The Ninth Circuit [in *O'Bannon*] affirmed this Court's determination that the
           NCAA's then-existing limits on payments to student-athletes served the
23         procompetitive goal[] of preserving amateurism . . . ." Defendant's Motion for
           Judgment on the Pleadings at 3, ECF No. 373.
24

25         These positions also put at issue the terms of individual broadcast and sponsorship contracts

26  that have continued to skyrocket in recent years—reflecting continuing and strengthened consumer

27  demand for these products—even as the NCAA and the conferences have loosened somewhat the

28  restrictions on compensation that may be paid to their football and basketball players. And, these

4

1  consumer demand arguments directly put at issue the marketing of these sports and the conferences

2  to consumers, and any analysis or discussion of attributes that actually drive consumer demand.

3         The Conference Defendants have also justified their restrictions based on the argument that

4  they are needed to "integrate" athletes into campus communities in support of educational interests

5  for these and other students at these schools, and otherwise improve the college experience for

6  students:

7
8  > "In [*O'Bannon*, the Northern District of California] held that appropriate limits on the
   > amount of compensation that student-athletes may receive while in school are lawful
   > under Section 1 because they serve the procompetitive goal[] of . . . (ii) integrating
9  > student-athletes into the academic communities of their schools, which in turn
   > improves the education the schools offer." Defendants' Memorandum of Points and
10 > Authorities in Support of Motion to Dismiss the Complaints at 1, ECF No. 89.

11 > "[T]his court has already held that the legitimate procompetitive goal[] of . . .
   > integrating student-athletes into their academic communities are furthered by
12 > appropriate limits on student-athlete compensation." *Id.* at 6.

13
14 > "Yet, plaintiffs ignore this Court's conclusion that the NCAA's legitimate
   > procompetitive goal[] of . . . integrating student-athletes into their academic
15 > communities justif[ies] certain limits on compensation to student athletes." Reply
   > Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss
16 > the Complaints at 9, ECF No. 100.

17 > "[T]he challenged NCAA rules limiting the amount of compensation that student-
   > athletes could be paid while in school yield some limited procompetitive benefits by .
18 > . . improving the educational services provided to student –athletes." Answer and
   > Affirmative Defenses of Defendant Pac-12 Conference to Plaintiffs' Second
19 > Amended Complaint at 19, ECF No. 203 (internal citations and quotation marks
20 > omitted).

21 > "The Ninth Circuit [in *O'Bannon*] affirmed this Court's determination that the
   > NCAA's then-existing limits on payments to student-athletes served the
22 > procompetitive goal[] of . . . promoting the integration of athletics and academics on
   > college campuses." Defendant's Motion for Judgment on the Pleadings at 3, ECF No.
23 > 373.

24
25 In short, the Conference Defendants have asserted multiple defenses, procompetitive justifications

26 and arguments that make the requested documents directly relevant to the prosecution and defense of

27 this action.

28

### B.     **The Specific Documents At Issue**

To rebut these claimed defenses and asserted procompetitive justifications, Plaintiffs served discovery requests seeking various financial, contract, marketing and student-welfare related documents.[2]    Plaintiffs initially faced nearly total obstruction from the Conference Defendants. Nonetheless, Plaintiffs repeatedly offered to address any legitimate confidentiality concerns that the conferences or their broadcast or other contract partners might have, and more precisely target the requests to address practical concerns that would not adversely restrict the production of relevant information.

Of the five Conference Defendants subject to the motion to compel, the SEC, Pac-12 and the Big 12 indicated a willingness to meet and confer to try to resolve the issues subject to the motion. Plaintiffs and the SEC were able to resolve almost all of the issues between them as to these documents, with just a few issues and potential redactions that the Court must decide as described in more detail below (Plaintiffs and the SEC are working on their remaining differences, and will advise the Court if they are resolved).  Since the revised briefing schedule was set in late May, the Pac-12 and the Big 12 continued to meet and confer with Plaintiffs, and these parties are continuing to work diligently towards a resolution, and will update the Court as soon as possible.  Plaintiffs are hopeful that all or almost all issues as to these documents will be resolved with the Pac-12 and Big 12 before the hearing date.

However, the Big Ten and the ACC have declined to have *any* further meet and confer discussions, even though the Court set the revised briefing schedule to encourage such discussions, and even though Plaintiffs invited the Big Ten and the ACC to have them, including as recently as last week.[3]    Plaintiffs have not heard a word—let alone an explanation—from the Big Ten or the

---

[2] The relevant requests, *Jenkins* Plaintiffs' First Set of Requests for Production of Documents, dated November 13, 2014, Nos. 18-20 (financial documents), 21 (contracts), 29 (marketing documents) and Consolidated Plaintiffs' Third Set of Requests for Production of Documents, dated August 14, 2015, Nos. 40-42 (financial documents), 43-44 (contracts), and the Conference Defendants' corresponding responses, are attached to the Parsigian Decl. as Exhibits 5-16.

[3] *See, e.g.,* Parsigian Decl., Ex. 17, Email from David Feher to Counsel for Big Ten, dated June 1, 2016 ("Plaintiffs have not received any word from the Big Ten that it is willing to have individual negotiations with Plaintiffs regarding the outstanding Motion to Compel issues concerning financial and related documents, notwithstanding Plaintiffs' repeated invitations to do so and such negotiations occurring with the SEC, the Pac-12 and the Big 12.  Please let us know as soon as

ACC as to why they are declining to have further meet and confer discussions regarding these requests.

The current status of the documents subject to the motion to compel, reflecting the most recent developments in the meet and confer process with the SEC, the Pac-12, and the Big 12, is as follows:

### 1.    Media Contracts

The SEC has agreed to produce its media contracts with ESPN and CBS, subject to an agreed upon redaction protocol under which the Court will resolve any disputes as to the scope of redactions.  ESPN also has agreed that it will not redact any provisions relating to the payment terms of the contracts.

Plaintiffs and the Pac-12 and the Big 12 are continuing to work towards a resolution regarding whether their respective contracts with ESPN may be produced, but each of these conferences also has a contract with FOX, which is taking the position that the contracts should not be produced at all.  That means the Court would need to determine why the FOX contracts should not be produced, when all other broadcasters have agreed to produce their contracts subject to a redaction protocol.  Plaintiffs are willing to have any redaction issues with the Pac-12 and Big 12 contracts determined by the Court as with the SEC.[4]

As to the Big Ten and the ACC, Plaintiffs are willing to agree upon a similar compromise with these conferences.  However, the Big Ten and the ACC have refused to produce any of their

possible whether the Big Ten is willing to have such negotiations, since time is short until the June 10 filing deadline for the MTC on unresolved issues.  Unless we hear otherwise, Plaintiffs will take the Big Ten's silence to mean that it is not willing to produce the documents that the SEC has already agreed to produce, including media and other contracts, financial statements, and projections (in each case with a redaction protocol), and contract negotiation documents as Plaintiffs have narrowed that request."); Parsigian Decl., Ex. 18, Email from David Feher to Counsel for ACC, dated June 1, 2016 (same); Parsigian Decl., Ex. 19, Email from David Feher to Counsel for Pac-12, dated May 24, 2016 ("We will proceed accordingly, but note that the Big10 and the ACC have not indicated any intention to engage in individual negotiations. If that is not the case, they should advise us as soon as possible since, as I have repeatedly noted, our door is open.").

[4] Plaintiffs and the Pac-12 are engaged in discussions regarding the extent to which certain documents must be produced from entities controlled by the Pac-12 (such as Pac-12 Networks which operates a cable channel for the conference, and Pac-12 Enterprises which sells conference-related sponsorship rights), including certain "carriage contracts" relating to the Pac-12 Networks.  Plaintiffs will advise the Court in its reply brief if they are unable to resolve this issue with the Pac-12.

7

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO COMPEL FINANCIAL DOCUMENTS, BROADCAST, MEDIA, AND SPONSORSHIP CONTRACTS, AND MARKETING DOCUMENTS- CASE NOS. 4:14-MD-02541-CW; 4:14-CV-02758-CW

broadcast contracts, even with a redaction protocol, or even to discuss the issue further with Plaintiffs.

It should be noted that the ACC's media contract is with ESPN, which has separately agreed to produce its SEC media contract without any redaction of any payment terms. *See* SportsBusiness Daily, June 15, 2016 ("Thanks to its ESPN contracts, ACC media rights 'have increased' 149% in the last three years. The ACC's '13-14 revenue total is nearly $11M more than the $291.7M the conference 'had estimated last spring'").[5]  As to the Big Ten, its current broadcast contract also is with ESPN, while it was publicly reported two months ago that the Big Ten is about to sign a record broadcast rights deal with FOX.  *See* Chicago Tribune, Apr. 19, 2016 ("The deal could be worth as much as $250 million per year — and that's for only half of the Big Ten's inventory. ESPN has been paying $100 million a year.").[6]  The Big Ten also has broadcast-related contracts with the Big Ten Network, which separately broadcasts Big Ten football and basketball games.  The Big Ten Network is 51% owned by FOX and 49% owned by the Big Ten itself.[7]

### 2.   Sponsorship Contracts

The SEC has agreed to produce all sponsorship contracts for its major sponsors that have been publicly identified by the conference on its website, and a protocol for the potential production of other such contracts.  Plaintiffs and the Pac-12 and the Big 12 are continuing to work towards a resolution of these issues.

Plaintiffs are willing to agree upon a similar compromise with the Big Ten and the ACC.  Those conferences, however, have declined to engage in any further meet and confer discussions.

### 3.   Negotiation Documents

In its meet and confer with the SEC, Plaintiffs agreed to limit substantially the production of documents related to contract negotiations.  Specifically, Plaintiffs agreed that such documents would have to be produced only if the document *also* referenced or concerned: (i) athlete

---

[5] http://www.sportsbusinessdaily.com/Daily/Issues/2015/06/15/Colleges/ACC.aspx
[6] http://www.usatoday.com/story/sports/college/2016/04/19/big-ten-jim-delany-new-deal-stunningly-big-deal/83247570/.  *See also* http://www.chicagotribune.com/sports/college/ct-big-ten-media-rights-20160419-story.html.
[7] *See* http://www.mediapost.com/publications/article/157692/fox-moves-to-majority-position-in-big-ten-network.html.

compensation or potential compensation, or any limits thereon; (ii) "amateurism" or the "collegiate model"; or (iii) any adverse or other impact or potential impact on the well-being of student-athletes or other students of any terms or potential terms in the negotiations.  Thus, this request is now narrowly targeted to negotiation documents that concern issues that are directly relevant to this action.  Plaintiffs are continuing to work towards a resolution of these issues with both the Pac-12 and the Big 12.

Plaintiffs are willing to agree upon a similar compromise with the Big Ten and the ACC.  Those conferences, however, have declined to engage in any further meet and confer discussions.

### 4.    Financial Statements

The SEC has agreed to produce its financial statements, subject to a redaction protocol as to certain limited information.  Plaintiffs are continuing to work towards a resolution of these issues with the Pac-12 and the Big 12.

Plaintiffs are willing to agree upon a similar compromise with the Big Ten and the ACC.  Those conferences, however, have declined to engage in any further meet and confer discussions.

### 5.    Projections

The SEC has agreed to produce its financial projections.  Plaintiffs are continuing to work towards a resolution of these issues with the Pac-12 and the Big 12.

Plaintiffs are willing to agree upon a similar compromise with the Big Ten and the ACC.  Those conferences, however, have declined to engage in any further meet and confer discussions.

### 6.    Financial Analyses

The SEC has agreed to produce documents analyzing the finances of the SEC that have been disclosed to the Commissioner, CEO, COO, or CFO (or any equivalent officer), and has represented that it has no documents analyzing the finances of its members (with such "finances" for purposes of the request being defined as any aggregate revenue or expense amount in excess of $1 million).  Plaintiffs are continuing to work towards a resolution of these issues with the Pac-12 and the Big 12.

Plaintiffs are willing to agree upon a similar compromise with the Big Ten and the ACC.  Those conferences, however, have declined to engage in any further meet and confer discussions.

### 7. __Marketing Documents__

During the meet and confer process, Plaintiffs offered to accept the following limited marketing related documents:

    i.    All documents sufficient to evidence any advertisement or promotion to consumers of college football, college basketball, or the conference.

    ii.    All documents that discuss or analyze any attributes of college football, college basketball, or the conference that attract consumers, but in an initial production only to the extent that such documents have been disclosed to the Commissioner, CEO, or CMO (or any equivalent officer) of the conference.

    iii.    All documents relating to the advertisement or promotion to consumers of college football, college basketball, or the conference that also (a) reference or concern athlete compensation or potential compensation, or any limits thereon; or (b) reference or concern "amateurism" or the "collegiate model," but in an initial production only to the extent that such documents have been disclosed to the Commissioner, CEO, or CMO (or any equivalent officer) of the conference.

The Conference Defendants objected to these requests on various grounds, including that they were not specifically covered in any request formally served by Plaintiffs. To address that issue, and consistent with the agreement reached with the SEC, Plaintiffs served a new formal request specifically requesting these documents. The SEC has maintained its objections to producing these marketing related documents, and Plaintiffs expect the other conferences to file similar objections before the hearing date on this motion. Plaintiffs are willing to address any practical issues as to the production of advertisements and promotions (so that, for example, every iteration of the conference's website or Facebook page need not be produced). However, these requests are narrowly targeted to address how these sports and the conferences have been market to consumers, or attributes of these sports or the conference that attract consumers, issues that are at the core of the Conference Defendants' own assertions about what drives consumer demand.

IV.   **ARGUMENT**

    A.   **Legal Standard**

        A party may serve on another party a request to obtain discovery concerning any non-privileged matter that is relevant to any party's claim or defense. Fed. R. Civ. P. 34(a)(1); Fed. R. Civ. P. 26(b)(1).  "Plaintiff[s] must show only that, given [their] claim, the requested discovery is relevant and proportional to the needs of the case" in light of the importance of the issues at stake. *Goes Int'l, AB v. Dodur Ltd.*, 2016 WL 427369 at *2 (N.D. Cal. Feb. 4, 2016) (citing Fed. R. Civ. P. 26(b)(1)).  "Information . . . need not be admissible in evidence to be discoverable."  *Id.*

        It is also well-established that the party resisting discovery bears the burden of showing why a discovery request should be denied.  *Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir. 1975).  Specifically, the party opposing discovery "has the burden to show discovery should not be allowed, and has the burden of clarifying, explaining, and supporting its objections."  *Hatamian v. Advanced Micro Devices, Inc.*, 2015 WL 7180662 at *1 (N.D. Cal. Nov. 16, 2015).

        Plaintiffs appreciate that burden is another consideration under Rule 26.  Accordingly, Plaintiffs have worked hard to narrow their requests for documents in the motion to compel to seek only those financial, contract, marketing and student welfare related documents that are directly related to the claims and defenses in this action.  The requests are targeted, and Plaintiffs have shown their reasonableness by agreeing to a redaction protocol so that claims of truly confidential information, that may not be relevant to this action, may be reviewed by the Court for resolution. Each of the remaining document categories, as refined through the meet and confer process, should be produced.

    B.   **The Requested Documents Should Be Produced**

        1.   **Contracts**

        As to broadcast and sponsorship contracts, those documents are highly relevant to this action, in multiple ways.  To begin with, the absolute size of the payments made to the conferences and their members shows that any argument by them that they cannot afford to pay more to their football and basketball athletes is ludicrous.  As noted above, the Big Ten's new media contract with FOX is estimated at $250 million per year, and other conferences have similarly mammoth media rights

11

1  deals of hundreds of millions of dollars each year.  The amounts of these contracts each year show
2  that these conferences and their members are awash in revenue created primarily due to the efforts of
3  their football and basketball athletes, and that these conferences and schools can well afford to pay
4  more to these athletes.

5        Moreover, the increasing amounts of these long-term contracts show both that even more
6  revenues will be available to the conferences and their members in the future years.  For example,
7  the SEC's contract with ESPN, which the SEC and ESPN have agreed to produce, has been reported
8  to expire in 2034, nearly twenty years from now, and be worth approximately $3 billion.[8]  This
9  shows the long-term stability of these revenues that are available to pay a greater share to these
10 athletes.

11       Further, the fact that the amounts paid under these contracts have continued to escalate, even
12 as football and basketball athletes were paid more compensation this past season for the first time in
13 decades covering their full cost of attendance, shows that loosening restrictions on payments to
14 athletes has had *no* adverse impact on the attractiveness of these media properties to networks and
15 consumers.

16       Plaintiffs similarly expect that the payment terms of these contracts will show that the
17 broadcast partners themselves do not put much if any economic stock in any notion that paying these
18 athletes more will somehow decrease the attractiveness to consumers of these sports properties.
19 Plaintiffs expect that broadcast partners have specifically protected themselves in the event of
20 various contingencies—such as schools changing conferences, but that, in one or more of these
21 contracts, the parties make no such contingencies for preserving "amateurism."  Finally, as to the
22 Conference Defendants' 'integration' and 'quality of the collegiate experience' arguments, Plaintiffs
23 believe the contract terms will illustrate the increasing time demands imposed on these athletes, with
24 games increasingly scheduled late at night on weekdays, to the point that college coaches themselves
25 have expressed outrage at the resulting harm.  *See* The News & Observer, Jan. 29, 2016 ("[UNC
26 basketball coach Roy] Williams said several other ACC coaches share the same thought. 'I didn't
27 know what Jimmy had said,' Williams said, using his preferred name for Boeheim, one of Williams'

28 ─────────────────
[8] *See*  http://www.cbssports.com/college-football/news/sec-espn-announce-sec-network/.

friends in the coaching profession. 'But I know there's four or five coaches that wonder what in the dickens are we doing? **And again, it's driven by TV. That's all it is.['] 'We sacrifice your third child and anything else for the dollar**.'") (emphasis added).[9]

Similarly, these television contracts have yielded schedules that severely disrupt athletes' academic and personal lives.  The Court need look no further than the 2015 football season to see the harm inflicted by such broadcast schedules:  Big 12 member West Virginia University, located in Morgantown, WV, had to travel more than 1,200 miles to Fort Worth, TX during a school week in October to play fellow Big 12 member Texas Christian University on a Thursday night in a game aired on FOX's cable sports subsidiary, Fox Sports 1.

The fact that the SEC and ESPN have already agreed to produce its contracts, subject to a redaction protocol, shows that there is no legitimate basis to withhold the other broadcast contracts. All of the conferences' other broadcast and sponsorship contracts should be produced, subject to the same redaction measures.

### 2.    Negotiation Documents

Plaintiffs have narrowly tailored and narrowed their request for contract negotiation documents to only those documents that also *also* reference or concern: (i) athlete compensation or potential compensation, or any limits thereon; (ii) "amateurism" or the "collegiate model"; or (iii) any adverse or other impact or potential impact on the well-being of student-athletes or other students of any terms or potential terms in the negotiations.  These documents are focused like a laser on issues that are directly at issue in this action, and there is no basis to shield them from discovery.

### 3.    Financial Statements

The SEC has agreed to produce its financial statements, subject to a limited redaction protocol.  As already reviewed above, the financial condition of the conferences is directly relevant to the claims and defenses in this action.  But this is true not only as to revenues.  The conferences' financial statements will reveal substantial information regarding the increasingly exorbitant expenses to which conferences have diverted money when they have artificially suppressed any need

---

[9] http://www.newsobserver.com/sports/college/acc/unc/article57356618.html.

1    to spend additional monies on athletes.   There is no reason to deprive Plaintiffs of these highly

2    relevant financial documents.

3                    **4.      Projections & Financial Analyses**

4            Here too the SEC has agreed to produce its financial projections and documents analyzing its

5    finances, with Plaintiffs agreeing to define "finances" for purposes of the request for financial

6    analyses as any aggregate revenue or expense amount in excess of $1 million.   These documents are

7    relevant for the same reasons reviewed above regarding other financial documents.   Financial

8    projections will also illustrate on a more comprehensive basis the increasing amounts of revenues

9    available in future years, in contrast to the claims of poverty and deficits heard so far from the

10   conferences.

11                   **5.      Marketing Documents**

12           This is the one category of documents where, so far, all of the Conference Defendants,

13   including the SEC, have objected to producing any of the requested documents.   These documents fit

14   two different "buckets."

15           First, Plaintiffs request documents sufficient to evidence any advertisement or promotion to

16   consumers of college football, college basketball, or the conference.   Plaintiffs are willing to address

17   any practical concerns regarding different iterations of websites, but the basic fact remains that the

18   Conference Defendants are defending their restrictions on the basis of claims that having their

19   current restrictions declared illegal will negatively impact consumer demand for college football and

20   basketball.   Given that, Plaintiffs have every right to detailed discovery on the nature of consumer

21   demand for these sports, and the advertisements and promotions that the Conference Defendants use

22   to attract consumers is highly relevant to assessing the extent to which, if at all, consumers really

23   base their consumption of these sports on the athletes not being paid any more for their efforts.

24   Plaintiffs' request for documents sufficient to evidence these communications with consumers is

25   more than reasonable.

26           Second, Plaintiffs' request for other marketing related documents is even more targeted,

27   seeking only those documents that have been disclosed to the Commissioner, CEO, and CMO (or

28   any equivalent officer) of the conference that (i) discuss or analyze any attributes of college football,

1   college basketball, or the conference that attract consumers; or (ii) relate to the advertisement or

2   promotion to consumers of college football, college basketball, or the conference that also (a)

3   reference or concern athlete compensation or potential compensation, or any limits thereon; or (b)

4   reference or concern "amateurism" or the "collegiate model."  These documents go to the core of

5   testing the conferences' assertions as to consumer demand, and what drives consumer behavior,

6   rather than the old saw that consumers will stop watching college sports if the athletes are paid more.

7          Indeed, Plaintiffs have already discovered that the NCAA and the conferences widely

8   compensate athletes above the cost of attendance, through "gift suites" and other means that are

9   centrally controlled, and which apparently have had zero impact on consumer interest in these sports.

10  Plaintiffs fully expect that the Conference Defendants' files have more than a few documents

11  illustrating that college sports fans' interest is driven by other factors such as school loyalty, and that

12  declaring the current restrictions illegal will have no or negligible impact on the attractiveness of

13  these sports to consumers.

14          **C.      There Are No Legitimate Confidentiality Concerns to**
                       **Prevent the Production of These Documents**
15

16         The SEC and its broadcast partners (ESPN and CBS) have agreed to produce the SEC's

17  media contracts, subject to a redaction protocol with the Court reviewing specific provisions *in*

18  *camera* in the event their disclosure is in dispute, along with modifications to the Confidentiality

19  Order to effect that protocol.  This agreement shows that means exist to protect any legitimate

20  confidentiality concerns.

21         Indeed, courts in the Ninth Circuit have overwhelmingly found that properly fashioned

22  protective orders provide sufficient protection against disclosure of commercial information.  *See,*

23  *e.g.*, *Pasadena Oil & Gas Wyoming LLC v. Montana Oil Properties Inc.*, 320 Fed. App'x 675 (9th

24  Cir. 2009) (finding that documents relating to "independent business activities" must be produced,

25  and that the district court can craft a protective order limiting the use of the information); *Live*

26  *Nation Merch. v. Miller*, 2014 WL 1877912, at *2-3 (N.D. Cal. May 9, 2014) (finding that concern

27  about protecting non-party confidential information should be addressed through a protective order);

28  *ASUS Computer Int'l v. Round Rock Research, LLC*, 2013 WL 6113253, at *2 (N.D. Cal. Nov. 20,

1   2013) (ordering, despite third-party privacy concerns, production of all relevant commercially

2   sensitive agreements and requiring the parties to either agree upon a protective order or submit

3   separate proposed orders for judicial review).  Thus, in this case, the Court is well within its "broad

4   discretion . . . to decide . . . what degree of protection is required" and compel production pursuant

5   to the Protective Order.  *Antman v. Uber Technologies, Inc.*, 2016 WL 164294 at *2 (N.D. Cal.

6   Jan. 14, 2016).

7           In fact, the Court previously said so in *O'Bannon* in reference to the Court's power to compel

8   production of commercially sensitive information where virtually the same documents and

9   commercial sensitivity were at issue: "if [the Court] ordered the . . . Big Ten Conference and

10  network and FOX to produce various licensing agreements . . . either the current version of the

11  protective order or some modification of it could protect some of those [confidentiality] interests."

12  Transcript of Hearing re Motion to Compel, *In re NCAA Student-Athlete Name Likeness Licensing*

13  *Litig.*, No. 09-1967 CW (N.D. Cal. Feb. 8, 2012), ECF No. 62 ("*O'Bannon* MTC Hearing

14  Transcript") at 12.  The commercial sensitivity of the material and request to amend the protective

15  order was "not a reason to not produce documents at all; [it was] just a way that could be used to

16  make a more flexible response." *Id.*

17          Moreover, the documents' importance to Plaintiffs' ability to rebut Defendants' main

18  defenses in this case further weighs in favor of disclosure, despite any desire by the Conference

19  Defendants or their broadcast partners to keep their contracts confidential.  *Thompson v. C&H Sugar*

20  *Co., Inc.*, 2014 WL 595911, at *5 (N.D. Cal. Feb. 14, 2014) (finding compelling need to allow

21  plaintiff to disprove defendants' primary defense theory, despite third-party confidentiality concerns,

22  and ordering production subject to a protective order).

23          In earlier submissions, the crux of the arguments against production was that certain outside

24  counsel here also represent conferences in other broadcast negotiations.  (ECF No. 311 at 5).

25  However, the current Protective Order (ECF No. 189) ("Protective Order"), provides for Highly

26  Confidential – Counsel Only designations, and is more than sufficient to protect against disclosure of

27  even highly sensitive commercial material.  *See, e.g.*, *Apple Inc. v. Samsung Electronics Co. Ltd.*,

28  No. C 11-1846 LHK PSG, 2012 WL 2862613 at *3 (N.D. Cal. July 11, 2012) (protective orders

1  allowing documents to be marked "Highly Confidential—Attorneys' Eyes Only" to be adequate to

2  protect third-party interests despite confidentially concerns).

3    Outside counsel litigating in one matter and negotiating in another is not a novel issue in this

4  Court, which has heard many disputes before involving sensitive trade secrets.  In *Nazomi*

5  *Communications, Inc. v. Arm Holdings PLC*, a producing party sought to prospectively bar certain

6  litigation attorneys from, inter alia, negotiating licenses against the producing party on behalf of any

7  client during the pendency of the case and five years thereafter.  2002 WL 32831822 (N.D. Cal.

8  Oct. 11, 2002).  The Northern District rejected this confidentiality argument and held that because

9  the attorneys in question were "'outside counsel' in the truest sense of the phrase," *id*. at *1, there

10  was no need to impose any restrictions on the information the attorneys in question could review or

11  any future bar on their activities, *id*. at *3.

12    Plaintiffs here are giving even more deference to the asserted confidentiality concerns by

13  agreeing to a redaction protocol.  This goes beyond what courts in this district have required.

14  *Holman v. Experian Info. Solutions, Inc.*, 2012 WL 2501085, at *6 (N.D. Cal. June 27, 2012)

15  (ordering production of documents in unredacted form where redactions were claimed to protect

16  non-responsive, highly sensitive business information and finding that such information could be

17  sufficiently protected by a protective order); *Apple Inc.,* 2012 WL 2862613 at *3 (ordering

18  production of unredacted documents where "Highly Confidential—Attorneys' Eyes Only"

19  designation was available).

20    There is, in short, no legitimate confidentiality issue to justify the withholding of these highly

21  relevant documents.

22          *      *      *

23    The issue of producing broadcast contracts and related documents arose in a somewhat

24  different context previously in the *O'Bannon* action, where subpoenas were served on non-parties,

25  and the claims at issue dealt with group licensing rights rather than compensation for player services.

26  However, in assessing those demands for documents from those non-parties, Your Honor observed:

27  **"[I]f the purpose here were to have a hearing on amateurism in athletics, then the relevance**

28  **would be very, very broad, and every one of the materials that is sought by the plaintiffs would**

1    **be relevant to that purpose.**" *O'Bannon* MTC Hearing Transcript at 7 (emphasis added).

2    The instant motion joins the issue anticipated by Your Honor in that earlier hearing and, as

3    Your Honor observed there, "every one of the materials that is sought by the plaintiffs would be

4    relevant to that purpose." *Id.* Plaintiffs have bent over backwards to narrowly focus the documents

5    requested here. Their core relevance to the issues in dispute in this action is clear. They should be

6    produced.

7    **V.    CONCLUSION**

8    For the foregoing reasons, Plaintiffs respectfully request that the Court compel the

9    Conference Defendants to produce the requested documents.

10    Dated: June 10, 2016            Respectfully submitted,

11    By    */s/ Steve W. Berman*            By    */s/ Jeffrey L. Kessler*

12      Steve W. Berman (*pro hac vice*)           Jeffrey L. Kessler (*pro hac vice*)
     Ashley Bede (*pro hac vice*)             David G. Feher (*pro hac vice*)

13      HAGENS BERMAN SOBOL SHAPIRO LLP     David L. Greenspan (*pro hac vice*)
     1918 Eighth Avenue, Suite 3300        Jennifer M. Stewart (*pro hac vice*)

14      Seattle, WA 98101               Joseph A. Litman (*pro hac vice*)
     Telephone: (206) 623-7292          WINSTON & STRAWN LLP

15      Facsimile: (206) 623-0594          200 Park Avenue
     *steve@hbsslaw.com*             New York, NY 10166-4193

16      *ashleyb@hbsslaw.com*          Telephone: (212) 294-6700
                             Facsimile: (212) 294-4700

17      Jeff D. Friedman (173886)        *jkessler@winston.com*
     HAGENS BERMAN SOBOL SHAPIRO LLP     *dfeher@winston.com*

18      715 Hearst Avenue, Suite 202       *dgreenspan@winston.com*
     Berkeley, CA 94710              *jstewart@winston.com*

19      Telephone: (510) 725-3000        *jlitman@winston.com*
     Facsimile: (510) 725-3001

20      *jefff@hbsslaw.com*             Sean D. Meenan (SBN 260466)
                             Jeanifer E. Parsigian (SBN 289001)

21    By */s/ Bruce L. Simon*            WINSTON & STRAWN LLP
                             101 California Street

22      Bruce L. Simon (96241)         San Francisco, CA 94111
     Aaron M. Sheanin (214472)       Telephone: (415) 591-1000

23      Benjamin E. Shiftan (265767)      Facsimile: (415) 591-1400
     PEARSON, SIMON & WARSHAW, LLP    *smeenan@winston.com*

24      44 Montgomery Street, Suite 2450     *jparsigian@winston.com*
     San Francisco, CA 94104

25      Telephone: (415) 433-9000        *Class Counsel for Jenkins and*
     Facsimile: (415) 433-9008         *Consolidated Action Plaintiffs*

26      *bsimon@pswlaw.com*

27      *asheanin@pswlaw.com*
     *bshiftan@pswlaw.com*

28

*Class Counsel for Jenkins and Consolidated*
*Action Plaintiffs*

Elizabeth C. Pritzker (146267)
Jonathan K. Levine (220289)
Bethany L. Caracuzzo (190687)
Shiho Yamamoto (264741)
PRITZKER LEVINE LLP
180 Grand Avenue, Suite 1390
Oakland, California 94612
Telephone:  (415) 692-0772
Facsimile:   (415) 366-6110

*Additional Class Counsel*

## ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)

Pursuant to Civil Local Rule 5-1(i)(3), the filer of this document attests that concurrence in the filing of this document has been obtained from the signatories above.

/s/ *Jeffrey L. Kessler*
JEFFREY L. KESSLER

19

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO COMPEL FINANCIAL DOCUMENTS, BROADCAST, MEDIA, AND
SPONSORSHIP CONTRACTS, AND MARKETING DOCUMENTS- CASE NOS. 4:14-MD-02541-CW; 4:14-CV-02758-CW