**\*\*\*AMENDED TRANSCRIPT\*\*\***

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Nathanael M. Cousins, Magistrate Judge

| | |
|---|---|
| IN RE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION ATHLETIC GRANT-IN-AID CAP ANTITRUST LITIGATION This Document Relates to: ALL ACTIONS _____ ) ) ) ) ) ) ) ) | No. 14MD02541-CW |
| MARTIN JENKINS, et al., Plaintiffs, vs. NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, et al., Defendants. _____ ) ) ) ) ) ) ) ) ) ) ) ) | No. C 14-02758-CW |

San Jose, California
Thursday, August 11, 2016

TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
RECORDING 2:13 - 3:19/3:26 - 3:42 = 82 MINUTES

APPEARANCES:

For Plaintiffs:

                                      Winston & Strawn, LLP
                                       200 Park Avenue
                                       New York, New York 10166
                        BY:  DAVID FEHER, ESQ.
                                  BENJAMIN SHIFTAN, ESQ.

(APPEARANCES CONTINUED ON NEXT PAGE)

2

1   APPEARANCES:   (Cont'd.)

2   For Pac-12:
                                Proskauer Rose, LLP
3                               2049 Century Park East
                                Suite 3200
4                               Los Angeles, California 90067
                          BY:   SCOTT P. COOPER, ESQ.
5
    For Big Ten Conference:
6                               Mayer Brown, LLP
                                71 South Wacker Drive
7                               Chicago, Illinois 60606
                          BY:   ANDREW ROSENMAN, ESQ.
8
    For CBS:
9                               Weil, Gotshal, Manges, LLP
                                767 Fifth Avenue
10                              New York, New York 10153
                          BY:   YEHUDAH BUCHWEITZ, ESQ.
11
    For Fox Networks:
12                        BY:   DAVID SINGER, ESQ.

13  For ABC and ESPN:
                                Cravath, Swaine & Moore, LLP
14                              825 8th Avenue
                                New York, New York 10019
15                        BY:   WES ERNHARDT, ESQ.

16
    Transcribed by:             Echo Reporting, Inc.
17                              Contracted Court Reporter/
                                Transcriber
18                              echoreporting@yahoo.com

19

20

21

22

23

24

25

3

<u>Thursday, August 11, 2016</u>                              <u>2:13 p.m.</u>

                    P-R-O-C-E-E-D-I-N-G-S

                        --oOo--

        THE CLERK:  Calling civil 14-2541, In Re: National
Collegiate Athletic Association Athletic Grant-in-Aid Cap
Antitrust Litigation, related to civil 14-2758, Jenkins et
al., versus NCAA.

        Counsel, please state your appearances for the record.

        THE COURT:  Let's take the -- let's take the --
the lead arguing attorneys for those that have got disputed
matters.  We do have a record of I think everyone present as
well as those on the phone, and we can speak to them -- I'm
sorry to interrupt before you even start speaking.  We do
have participants on the phone, and hopefully they can hear
what's being said, but for their benefit, if everyone can
remember to speak into a microphone and slowly enough -- and
I corrected myself -- that we can make a transcription if
one is desired down the road.  There's not a court reporter
present.  So we do need to speak into the microphone for
that reason.

        If someone on the phone does have an objection or
something to say -- I hope you won't have many objections or
things to say or you'd be here in person, but please speak
up, and we'll pause for that.

        So with that brief introduction, we'll take the lead

4

1    counsel's introductions.

2         MR. FEHER:  Good morning -- or afternoon, your

3    Honor.  David Feher of Winston and Strawn, counsel for

4    Plaintiffs.

5         THE COURT:  Good afternoon.

6         MR. ROSENMAN:  Good afternoon, your Honor.  Andrew

7    Rosenman of Mayer Brown, on behalf of Defendant, Big 10

8    Conference.

9         THE COURT:  Good afternoon and welcome.

10        MR. COOPER:  Good afternoon, your Honor.  Scott

11   Cooper of Proskauer Rose on behalf of Pac-12.

12        THE COURT:  Good afternoon.

13        MR. SINGER:  Good afternoon, your Honor.  David

14   Singer on behalf of the intervening parties we've been

15   referring to as the Fox Networks.

16        THE COURT:  Good afternoon.  All right.  And let

17   me try to set the stage on what we have presented today, and

18   you can tell me if I'm missing something that's presented,

19   and there have been some recent updates from you.  And let

20   me say I brought in as a visual aid the foot of paper that

21   we could be resolving today, but through the hard work and

22   persistence of the attorneys on all sides, you've been able

23   to resolve most of the issues.  There are many complicated

24   issues that if we had to resolve them here could be thorny

25   and be very cumbersome and challenging to resolve.  So I

5

1  really appreciate the efforts that have been taking place

2  over a period of time to resolve the many challenging

3  discovery issues.

4       So we have a subset remaining from what was at one

5  point a substantial number of discovery issues, and I

6  appreciate everyone's participation in the process of

7  getting where you are today.

8       So, starting out, of course, we had a discovery letter

9  311, which then was superseded by a motion to compel filed

10 by the Plaintiffs at 402 in the NBL docket, and that's also

11 at 218 in the Jenkins document -- docket.  There have been

12 resolutions -- this is a motion to compel against the Power

13 5 so-called conferences, SEC, Pac-12, Big 12, Big 10 and

14 ACC.

15      There was an earlier order with the SEC.  The SEC was

16 the first conference to resolve the motion -- the motion to

17 compel issue.  At 467 there was a supplemental stipulation

18 with the SEC resolving -- clarifying and confirming some of

19 the resolutions as against the SEC.

20      As to the Big 12, at docket 457 there was an agreement

21 as to how to resolve the issues of the motion to compel.

22 With the ACC, there was a stipulation at 471 resolving those

23 issues.  With the Pac-12, at 473 there was a resolution as

24 to most of the issues, but one open issue was identified.

25 That's at docket 473, and we can come back to review what

6

1  that particular issue is.

2       And then, finally, with the Big 10, there was an update

3  sent at 474 which said that the -- they're not going to

4  complete resolution, but the Plaintiffs had proposed to the

5  Big 10 the same terms that had been proposed and agreed upon

6  with the Pac-12, but it appears as between the Plaintiffs

7  and the Big 10 that that's where the most issues in dispute

8  remain.

9       So I think that's the -- the procedural posture with

10 the different conferences.  Let me pause there to see if the

11 parties have additional issues that we think are in dispute

12 and should be resolved today.  All right.  Do any of the

13 conferences see things differently?

14      All right.  And so here's my thinking as to what's the

15 way to address those two remaining issues.  I want to

16 inquire with the Big 10 counsel as to whether you think your

17 argument should go first as to sort of all the issues in the

18 motion or if we should seek to resolve the Pac-12 one kind

19 of small remaining issue and then to have you go second.  It

20 all depends upon whether your arguments are contingent upon

21 that one resolution of that one issue with the Pac-12 or

22 they're separate and apart.

23           MR. ROSENMAN:  Your Honor, Mr. Cooper and I spoke

24 before the hearing because we anticipated that your Honor

25 may have that question, and we ultimately would defer to

7

1  whatever preference your Honor has as to the order of

2  arguments for the issues.

3          THE COURT:  All right.  So thank you.

4          MR. COOPER:  Your Honor, and Mr. Feher and I have

5  also continued to have discussion since the last time that

6  Mr. Rosenman and I spoke.  I -- I think we both think that

7  it would be best to defer the Pac-12 issue until after

8  you've heard from the Big 10 simply because my arguments are

9  a subset of their arguments, and it may make sense to get

10 the Court's guidance before we try to resolve it.

11         THE COURT:  Yeah.  So that's -- thank you.

12     Mr. Feher, what do you think?

13         MR. FEHER:  We're in agreement.

14         THE COURT:  All right.  And, Mr. Singer for Fox

15 Networks, you're -- do you have a view as to -- and I know

16 your overall interest in the proceedings, but as to whether

17 we deal with the Pac-12 first or the Big 10 first, whether

18 you have a preference one way or the other on that?

19         MR. SINGER:  Our preference is Big 10 speak first

20 because it covers more of our issue (indiscernible).

21         THE COURT:  All right.  As you all deduce, how I

22 rule on the first one might be suggestive of how I'll rule

23 on the second one.  So there might be an opportunity in

24 between for further conferring and quick thinking about

25 whether you can resolve yourself the remaining issues.

8

1    So my thought is to deal with the broader issues first.

2   That's the Big 10 motion, because it has more issues to

3   resolve, and potentially my ruling there will be suggestive

4   of -- or leave you more feedback as to how I might view the

5   dispute with the Pac-12.  But, again, I -- I have read all

6   the briefs submitted, including those that were submitted

7   before you had some resolutions.  So I do have the context

8   that there are many things that were in dispute at one point

9   that are not in dispute now, and we are dealing with a

10   subset.  So that's the -- the posture of things.

11    Now, I have also -- I know that there was a motion for

12   judgment on the pleadings that was presented to Judge Wilken

13   and was resolved since we were last here.  So that's also

14   part of the overall situation.

15    So let's deal with the motion to compel against the Big

16   10.  And, Mr. Feher, if I can start with you and just a bit

17   of an update on the overall scope of discovery and how this

18   kind of contextually fits in, and my focus here is on both

19   relevance, and that's part of the analysis and burden, but

20   also proportionality, and proportionality consideration is

21   this is not in a vacuum.  You do have discovery from

22   different sources in the case.  That discovery process is

23   ongoing.  You now have recently some commitments for

24   additional information from some of the conferences and

25   other sources.

9

1      So can you give me an overview of sort of with what's

2  remaining against the Big 10 how that fits in with the other

3  discovery you're seeking.

4           MR. FEHER:  It's an interesting question.  I will

5  tell you that before I came here today, one of my thoughts

6  was, well, we already have four out of five resolved, so

7  would it be a good day regardless.  And my reaction in my

8  own heart and head was no, and the reason for that is

9  actually on a couple of different levels.  One is is that if

10 we receive the information from all of the conferences but

11 not from the Big 10, it would leave a very substantial hole

12 in discovery.  It would leave a substantial hold in

13 discovery in terms of information that we would not get

14 where we would not know what we would not get, and I can't

15 tell you exactly what that is.  It's like any person seeking

16 discovery.  You don't know what's in the files.  I have my

17 own suspicions there, but quite apart from that, I know for

18 a fact that it's extremely likely that a very very important

19 piece of evidence relating to a core issue in this case is

20 at stake here.

21     Why are we here today?  We're here today not because of

22 any claims that the Plaintiff raised or that started the

23 case, but we're here on this particular issue because the

24 Conference Defendants, along with the NCAA, have raised pro

25 competitive justifications and arguments in response to the

1  claims.  One of them relates to general financial issues.
2  We'll get into the other issues, but in terms of one thing
3  in particular, there is at the core of this case an
4  assertion that if Plaintiffs are granted any relief, that it
5  will be a large blow or maybe even some kind of death nail
6  to consumer demand for professional -- I'm sorry -- for
7  collegiate football and collegiate basketball, not
8  professional.  I'm sorry.  I have some other clients I've
9  been dealing with earlier today.  So that was related to
10 those other matters.
11     And in terms of that, consumer demand is not a small
12 thing.  This case involved substantial arguments from the
13 Defense saying that we should get no relief on Plaintiff's
14 side because consumers would be less interested in the
15 product if any additional relief is granted so that the
16 current restrictions can be exceeded in any way, shape, or
17 form and that that's a fundamental problem and there have
18 been all sorts of arguments claiming that that's a core
19 concern.  Sometimes it's argued at the context of
20 amateurism.  I don't want to get into that term.  The thing
21 I'll note regarding the decision on the judgment on the
22 pleadings, Judge Wilken made it very very clear that that
23 decision related to just one scope of the remedy in this
24 case and there's quite a bit left in terms of room for other
25 remedies in terms of benefits.  We'll all address that at a

1 later date, but any suggestion that there is not going to be
2 the same type of argument as to whether whatever relief
3 Plaintiffs get will implicate the same consumer demand
4 issues I think just isn't well founded.  Unless and until
5 Defendants stand up and disavow any argument relating to
6 consumer demand or consumer interest or any argument
7 relating to financial issues, these issues are important.
8      Now, how does this relate to the Big 10?  Earlier this
9 year it was publically announced that the Big 10 had signed
10 or had agreed to -- not signed but had agreed to one of the
11 largest and perhaps the largest new media contracts ever in
12 collegiate football.  That is with Fox Network and also with
13 ESPN that would result in I believe more than $250,000,000 a
14 year with respect to Fox and more than $400,000,000 a year
15 combined with the two.
16      Now, if we don't have the Big 10 contract, assuming
17 that before the time of trial, hey, the issue the contract
18 is resulting out of all blows up and it goes away, then
19 we'll have the current contracts, but assuming that that
20 contract goes to consummation, to be clear -- because this
21 was a big issue raised by the Big 10 in their papers --
22 we're not looking for anything during the negotiation
23 process, but once that contract is in place, that contract
24 in and of itself is going to tell a very large story on a
25 core issue of this case because you can just tell by the

12

1 report from the numbers already out there in the public

2 realm that despite Defendants' protestations that even if

3 any more is given to the Plaintiff athletes, that their

4 arguments just don't hold water at all.  This past year for

5 the first time rules were liberalized such that the students

6 could get the full cost of attendance.  Before it happens,

7 we said, oh, we could never do this.  It's terrible.  This

8 happened, and now the schools are saying, "Well, we can live

9 with it just fine."  Students are enjoying benefits that

10 they didn't have before.  The full cost of attendance is

11 being paid.

12      It was not the end of the world.  As a matter of fact,

13 it was far from the end of the world.  It was a world in

14 which the Big 10 apparently is receiving the largest media

15 rights on track in history.  And so in terms of is the Big

16 10 issue proportionate and relevant to this case, I think

17 there's no question that that contract will be a very very

18 important issue for the trial of this case.  I think,

19 besides that, given the Big 10's standing in intercollegiate

20 sports as one of not just the Power of 5 but one of -- and

21 I'm not casting aspersions on any of the other conferences,

22 but one of the most successful conferences out of the Power

23 of 5, their financial performance has been astounding, and

24 it's been astounding in ways not just reflected in the

25 documents that have been turned over in terms of the Form

13

1  990's which have aggregations in all sorts of ways, but it

2  really gets to kind of the core of what's going on here, and

3  it's very important as to why individual transactions are

4  important.

5      This isn't some theoretical argument.  The Supreme

6  Court in the NCAA Board of Regents case, is 100 percent

7  clear that the dollar amounts paid under broadcast contracts

8  are reflective of consumer demand, and one of the reasons

9  the Supreme Court ruled as it did in that case was because

10  the restraints there regarding broadcast contracts did not

11  allow consumer demand to be responded to.  There were

12  artificial constraints.  But the connection between

13  individual broadcast contracts -- broadcast deals and

14  consumer demands I think is incontestible but has been

15  emphasized by the Supreme Court.

16      Here what we have is individual contracts being prime

17  indicators of consumer demand and prime indicators of the

18  increasing demand for these intercollegiate athletic

19  products.  The explosive growth of these contracts is going

20  to be prime evidence in the case, and I think for anyone to

21  say "Oh, can't you do just fine" without evidence that is

22  likely to be very telling, very illustrative and I think

23  tell a large large part of this story on a core issue of

24  this case would be too much.

25          THE COURT:  Let me ask you just a pragmatic

14

1  question.  You submitted shortly before this hearing an

2  update with E-mails back and forth about your current

3  negotiating position.

4           MR. FEHER:  Yes.

5           THE COURT:  You aren't necessarily bound by your

6  negotiating position, and you could seek all of the relief

7  that you had in your initial motion to compel.  You are not

8  limited against this conference by what you've agreed to at

9  the other conferences.

10      So are you asking for everything that you've asked for

11  from the Big 10 or are you proposing to me that I grant the

12  relief -- you know, consistent relief as to what you've

13  agreed to with the other parties?  What's your ask?

14           MR. FEHER:  Your Honor, I thought about that as

15  well prior to the hearing, and I'm of two minds, and the

16  reason I'm of two minds is because of the different paths of

17  negotiation comparing the Big 10 to the other conferences.

18  I spent the last four weeks on the phone constantly with the

19  other conferences.  I'm not asking them to testify on my

20  behalf, but I assure you when you look at the letter

21  agreements with the other conferences and all the detailed

22  issues and our Plaintiff's efforts to try and address

23  particular concerns with respect to the other conferences,

24  where the ACC had one set of files and marketing documents

25  are set up and, you know, the Pac-12 had another set of

1  documents and how they maintained their files.  We dug deep

2  into the earth to address those concerns, and in part I

3  offered compromises and did things I didn't want to do in

4  order to reach those hard compromises to try and push this

5  case along in an efficient way.  Just to give one example on

6  the Pac-12, in our papers I mentioned the CFO documents were

7  very important, and I wanted to get them, and the compromise

8  with respect to the CFO's files in the end I said, "Okay.  I

9  will not seek those."

10       So when I say I'm of two minds, it's a little bit

11 difficult for me to say to the Big 10, which while we had

12 conversations, you know, a year ago, nine months ago, six

13 months ago at a very early stage, we've had zero

14 negotiations to speak of since June.  We've given multiple

15 invitations to have discussions, and it's been met with

16 silence.  And so I don't especially like rewarding a

17 negotiating party with the same terms that were gotten by

18 the last party at the table who, you know, we reached a deal

19 before we came here, and I really would defer to your Honor

20 because I can't -- you know, I don't want to say I'd be

21 happy with what the Pac-12 agreed to because I think that's

22 kind of my minimum ask, but in terms of the broader context

23 of the case, I believe that judicial administration is done

24 best when parties are encouraged to cooperate and I think at

25 least for the last three or four months it's been radio

1 silence, which has been a little troubling.

2        THE COURT:  All right.  Let me hear from Mr.

3 Rosenman about the Big 10's views on all this, and I'll come

4 back to you with some more detailed follow-up on that.

5    All right.  So what makes the -- the Big 10 difference?

6 And here we're not in the context of -- you know, at least

7 not in the context that I'm looking at it from of just the

8 abstract of is this information relevant.  I'm really

9 interested in why it would be fair to have compelled

10 discovery from the other comparable conferences and not the

11 Big 10.  What makes the Big 10 different?

12        MR. ROSENMAN:  Well, a couple of things, your

13 Honor.  First of all, as we pointed out, we're in the middle

14 of negotiations.  And, in addition to the relevance

15 arguments, we've pointed out -- and I disagree with Mr.

16 Feher that we haven't proposed reasonable compromises.  The

17 exhibits to our brief, we put in Exhibit 13, shows the type

18 of compromises that we've proposed.  Both we and Fox worked

19 together to provide two specific types of compromises on

20 these issues.

21    The underlying media agreements aren't relevant.  If

22 your Honor wants me to address that point either now or

23 later, I'm happy to do that, and we think we have persuasive

24 arguments in that respect.

25    With respect, though, to your Honor's specific

17

1  question, we propose to provide the specific provisions of

2  the agreement that deal with seven different topics,

3  including the pro competitive justifications that have been

4  asserted.  All of that was proposed in our July 1st letter

5  to Mr. Feher, and we also proposed, in addition to that, as

6  attached as Exhibit A to the declaration of Brad Traviola

7  (phonetic), the addendum to the audited financial statements

8  that includes the auditor verified aggregate distributions

9  by category in nine different categories.  One of those

10 categories, your Honor, is the television rights fees that

11 are actually paid to the member schools.  And I think it's

12 important to understand that the conference, as we pointed

13 out, places no parameters on what schools do with the

14 distributions.  So the argument that some schools can or

15 can't afford to pay above cost of its attendance really is

16 dependent on each school's ability or inability to pay.  The

17 conference is a pass-through.  That's clear from the face of

18 the Form 990's that we provided.  It's also clear from the

19 Traviola declaration.

20     So all the information that's relevant is what do the

21 schools actually receive.  It seems to us it's a perfectly

22 reasonable compromise to give the Plaintiffs the total

23 dollars received by each school, whether it's, let's say,

24 $10,000,000 to the University of Michigan.  Whether that

25 school gets $5,000,000 from the Fox deal, $3,000,000 from

1  CBS or $2,000,000 from ESPN shouldn't matter.  The point is

2  is here is the money that the school gets from the

3  conference through these deals, and what it chooses to do

4  with that money is entirely up to the schools.  There are no

5  parameters.  Nor do the schools have to report back to the

6  conference what happens with them.

7       So, aside from the relevance issue, there are far more

8  simple ways to provide this information.  We produced the

9  Form 990's.  We offered to produce these two forms of

10 compromise in July.  Mr. Feher rejected them out of hand.

11 From our perspective it's not fair to say to us that we

12 didn't engage in a compromise process.  We tried.  They

13 didn't agree.

14      Our view of it is Mr. Feher made his proposal.  It was

15 something that was not acceptable to us.  We made our

16 proposal.  It wasn't acceptable to Mr. Feher, and that's why

17 we're here today, your Honor.  But to say that we didn't

18 engage in any discussions in the past three or four months

19 is just not true, and one way that Mr. Feher could have

20 handled it was to take our compromise on July 1st and say

21 "Let's set up a call to discuss this so we can see if we can

22 work through some of these issues."  He didn't propose that.

23 He came back and said, "Well, we're going to make the same

24 proposal that we provided to the Pac-12 and to the SEC."

25 That's the same relief they sought in the motion to compel.

1   And so we responded to that on July 8th by saying that's

2   sort of a hollow offer from our perspective.  You're asking

3   for the same relief that you're seeking through the motion

4   to compel.  Last night at midnight, he sends an E-mail

5   saying "We're still offering the same proposal that we made

6   to the Pac-12."  Today in court he seems to say "Well, maybe

7   we'll ask for broader relief through the motion to compel."

8          THE COURT:  No, that was at my invitation.  But I

9   wanted to get a sense for where you all were in your

10  conversation.

11     I've got a concern for the fairness here if I -- if I

12  were to deny the motion as to -- against the Big 10, and it

13  might be seen as punishing the other four conferences who

14  agreed to compromises that they were being too reasonable

15  and that we have a discovery dispute next time down the

16  road, and same counsel, same conferences are going to say,

17  "Well, that was a bad idea to be reasonable and agree to

18  compromise.  We got a worse deal than did a conference that

19  litigated and fought it out."

20     How should that impact my analysis?

21          MR. ROSENMAN:  It shouldn't impact your analysis,

22  your Honor.  There are all sorts of reasons why parties make

23  deals to settle or resolve all sorts of issues.  The

24  Plaintiffs say in their brief that -- on page six of the

25  reply:

20

1            "The relevance of these contracts

2             is also shown by the willingness of the

3             SEC, Big 12, and Pac-12 to produce them

4             subject to the redaction protocols."

5       But if you look at what the agreements that they --

6   that Mr. Feher cosigned with each of those conferences, all

7   of them include provisions that specifically say that these

8   conferences reserve the right to challenge the relevance and

9   admissibility of these documents.

10       So on one hand they're saying to the Court, well, the

11  relevance is shown by these agreements that were produced.

12  At the same time the conferences have all said they're not

13  necessarily relevant.  Now, why they chose to produce them

14  is up to each conference, but just as if you have a case

15  with multiple parties where one party decides to settle,

16  that doesn't show liability as to any other party, and the

17  non-settling party shouldn't --

18            THE COURT:  It doesn't prove it, but it might

19  suggest that there is something there  And here there is a

20  similar situation.  In some co-defendant cases there's

21  different roles of the different defendants.  Your -- my

22  tentative view is that the conferences are very similarly

23  situated as far as the information that they possess, and

24  the relevant -- the relevance argument should be similar to

25  each of them.

1     Now, you each have different documents and different
2 concerns, and you're right you may have different
3 motivations to object or not, but as far as the core
4 relevance to the defenses in the case, it would seem to me
5 that if the ACC possesses relevant financial information and
6 the Pac-12 possess relevant information, I couldn't find
7 that the Big 10 does not possess relevant financial
8 information.  That wouldn't make any sense.  So I think that
9 if I were to agree with you entirely and say -- I'm
10 exaggerating your position -- none of this is relevant and
11 I'm not going to grant any relief to the Plaintiff, well,
12 then I should also give the same relief to the other four
13 conferences and say "Well, I've looked at all of this, and
14 I've determined none of it's relevant, and I'm not going to
15 allow any discovery."
16     But my -- my concern here is just the fairness between
17 the different conferences and also the example that the
18 resolution of this dispute sets for future discovery
19 disputes in this and other cases.
20     And something else you touched on, the protective
21 order.  So you're right, the resolution of the other
22 conferences has set forth a process that may -- may have
23 further disputes down the road about confidentiality and
24 redactions of particular pieces of information, but it has
25 set forth process for that -- that discovery.

1      Why can't a similar process be effective to protect the

2  asserted confidentiality concerns and -- that have been made

3  in your papers and also at Fox Network, why can't that

4  process and a protective order that has included in it the

5  attorneys' eyes only and other two-tiered or even more tiers

6  of protection for particularly sensitive information, why

7  can't that protect the information of the Big 10?

8           MR. ROSENMAN:  Well, they have concerns about the

9  protective order both because the outside counsel were

10  negotiating these agreements where the Big 10 would be

11  limited in terms of their ability to negotiate future

12  contracts, number one.  Number two is the media negotiations

13  are ongoing for our clients as well.  In our view, of

14  course, you shouldn't get to the issue of the protective

15  order unless the Plaintiffs have established both relevance,

16  need, and so forth.  And so, you know, those are some of the

17  most easily identifiable problems with the protective order

18  in our view.

19           THE COURT:  All right.  Anything else you'd like

20  me to consider?  And if the other counsel want to chime in,

21  I will give them an opportunity to, but as to the over-

22  arching interest of the Big 10, anything else you'd like me

23  to consider?

24           MR. ROSENMAN:  There's sort of two principal

25  points, your Honor.  One is as to the relevance of these

1 agreements, and back in 2012, when Mr. Singer and I were

2 before you, we addressed this issue of Name, Image and

3 Likeness, and that case, your Honor, addressed the relevance

4 of the contract -- of the media agreements in the context of

5 the case dealing with Name, Image and Likeness, and -- which

6 was the subject of the contracts.  And even in that case,

7 the Court recognizing the highly confidential nature of

8 those agreements said all that is going to be required is

9 production of those specific provisions that deal with Name,

10 Image and Likeness and the -- the Big 10 and Fox do not have

11 to produce the financial terms of those agreements.

12      It seems to us that the case for saying that the

13 agreements are relevant here is even more attenuated.  The

14 Plaintiffs, in fact, in their reply on page one on line nine

15 say specifically that the only reason that they've raised

16 this issue is because of the asserted defenses that we've

17 purportedly raised.

18      So, in essence, what the Plaintiffs are saying is the

19 media agreements have nothing to do with our case, your

20 Honor, nothing with respect to the claims.  And, of course,

21 the standard under Rule 26 is whether they're relevant to a

22 claim or defense.  And so they're not relevant to a claim.

23 They're only purportedly relevant as to a defense.

24      Now, the reliance on this theory that, well, it's

25 necessary to show consumer demand, is based on a citation to

24

1  the expert at class certification who opined generally that

2  many Division -- or most Division I institutions may have

3  difficulty in the event that the cost of attendance limit is

4  above.  At that time, of course, the Ninth Circuit hadn't

5  ruled then on the O'Bannon case and hadn't said essentially

6  that the principal of amateurism is a legitimate

7  "competitive defense," and the rule of reason requires that

8  the NCAA permits schools to pay no -- nothing more then.

9      In the context of that expert opinion, the expert's

10 talking about Division I schools.  There are 350 Division I

11 schools.  A hundred and twenty-five or so of those schools

12 are on the football championship subdivision.  The Kennesaw

13 State Owls in the Big South Division -- in the Big South

14 Conference and schools in the Big Sky Conference like here

15 in California, the Sacramento State Hornets, are not teams

16 that have 100,000 person stadiums, that don't have a lot of

17 the ability to make changes like the one that Plaintiffs

18 want across all Division I.

19     And so it's incorrect to take that snippet of our -- of

20 the expert's opinion and then say, "Well, essentially all

21 the Defendants have put this at issue" because of his

22 reference to that with respect to consumer demand.

23     The finances of the conferences, your Honor, are not

24 really relevant here at all.  What happens is a conference

25 is a pass through.  All the money goes to the member

25

1  schools, and what those member schools decide to do is
2  really up to them.  So the media agreements aren't going to
3  shed any light on the ability of a school to pay or not pay.
4  Why?  Because the school gets its money, and then each
5  school can pursue whatever institutional missions it wants.
6  So if Stanford wants to build a new engineering school or
7  another school wants to, you know, endow additional
8  professorships or they create a new engineering program that
9  they didn't have before, all of those things aren't going to
10 be addressed by the production of media agreements.  In
11 fact, production of media agreements, especially as to
12 future revenues, doesn't really help anything because it's
13 essentially saying, "Well, we know your assets in the future
14 will be X dollars."
15     Well, that in isolation isn't suggestive of anything
16 because you don't have things like the expenses that would
17 be incurred by the conference or, more importantly, by the
18 schools.  You don't know what's going to happen in the
19 future.  In the Big 10 at least, 13 of the 14 universities
20 are state schools.  A lot of their revenues are controlled
21 by the state legislatures, and so, for example, just because
22 the conference may be getting a lot of money from media
23 agreements doesn't mean in the future that the school is
24 going to receive the same types of payments from the
25 universities.

1       And so all of this is sort of speculative as to what's

2   going to happen in the future.  Simply saying "Well, we need

3   the media agreements to show that there's this increase in

4   revenue," we've produced, your Honor, eight years of

5   financial information through those Form 990's.  The Form

6   990's show all revenue.  Arguably, they're more encompassing

7   than the media agreements because the Big 10, for example,

8   generates additional revenue through its championship

9   events, ticket sales, Big 10 network profit shares and other

10  things, all of which, by the way, are disclosed through the

11  -- through the Form 990's, the documents we offered to

12  produce, the documents we produced.  And, in addition, there

13  are less intrusive methods to get this discovery.

14      Why couldn't the Plaintiffs serve a narrowly tailored

15  interrogatory request, a request for admission if the

16  information related to those media agreements supposedly is

17  so important?  That would be one way for the Court to

18  balance the so-called need that the Plaintiffs have

19  identified versus the very serious concerns that we have

20  about producing confidential, competitively sensitive

21  information that no other conference should see and that no

22  other conference shares with us with respect to their

23  agreements.  And, similarly, as the networks can tell you,

24  the networks also treat these documents as confidential and

25  don't share them.

1   So that at least is some of the reasons why as to both

2   relevance and need the Plaintiffs haven't met our burden of

3   overcoming our objections.

4          THE COURT:  All right.  I'm going to -- I'll pause

5   there.  I'm going to give Mr. Singer a chance to talk about

6   Fox Networks' interest in the proceedings, and I will get

7   back to Mr. Feher for the Plaintiff.

8       Thank you.

9          MR. SINGER:  Thank you, your Honor.  This is David

10  Singer on behalf of Fox Networks.  I want to take a step

11  back.  Your Honor mentioned proportionality.

12      With respect to -- and I can't speak to the rest of the

13  discovery disputes, but with respect to the TV agreements,

14  the Fox TV agreements, proportionality is not the applicable

15  standard here, and I'll explain why, starting with the fact

16  that it's undisputed and unrebutted that the Fox TV

17  agreements contain trade secrets and highly confidential

18  information.  We submitted two declarations.  They were

19  unrebutted.  Not a peep from anyone that refuted that.  So

20  that is our starting point.

21      Under -- now, the case that discusses this the most so

22  it gets cited a lot is the In Re Remington Arms case which

23  we cited in our brief out of the Eighth Circuit where the

24  Eighth Circuit sets up a -- basically a three-part test, and

25  that test -- and, by the way, the Eighth Circuit, and the

28

1  Ninth Circuit as well -- I'll give the Court the cite -- has

2  held that it's reversible error to not apply the correct

3  standard where the party who is opposing discovery

4  establishes that the information is a trade secret or highly

5  confidential.  The burden shifts back to the party seeking

6  the discovery to show both that it is relevant and that

7  there is a need for it, in other words, that it's not

8  available from another source, and only then if the party

9  seeking the discovery shows both relevance and need, which

10 is a very high burden, then does the Court balance that need

11 versus the potential harm that would come to the party who's

12 opposing the discovery.

13      And the <u>Remington Arms</u> case really goes into it.  The

14 10th Circuit is in accord.  The Ninth Circuit in a much

15 earlier opinion that actually wasn't cited in the <u>Remington</u>

16 <u>Arms</u> case, but I'll give the cite to the Court if the

17 Court's interested -- it's the <u>Hartley King Company</u> case <u>v.</u>

18 <u>U.S. District Court for the Southern District of California</u>.

19 That's 287 F.2d 324, and there the Ninth Circuit held -- and

20 this was in a writ of mandamus proceeding that disclosure of

21 trade secrets will be required only where such disclosure is

22 relevant and necessary for the prosecution or defense of a

23 particular case.

24      The Central District has applied that burden shifting

25 standard.  The Northern District has applied it.  Your Honor

29

 1  in some cases actually cited in the Plaintiff's brief has

 2  applied arguably even a stricter standard where your Honor

 3  required a compelling need and inability to get the

 4  information from other sources.  So this is more than just

 5  proportionality that we're talking about because we've

 6  established that the information in the TV agreements is

 7  trade secret and highly confidential.

 8      I won't belabor the Court with more argument on that

 9  point, but if there is curiosity or doubt in the Court's

10  mind that this is the correct standard, I'd be happy to

11  address more of the cases that have found that.

12          THE COURT:  Fox has commercial relationships with

13  many different entities, different conferences and schools

14  and professional, amateur, different associations.  Why

15  should I treat the Big 10 differently than the other

16  conferences?  If I've -- if I determine that there is

17  relevance and need for the other four conferences, how could

18  I determine that there was not relevance and need for

19  discovery of the same type of media agreements between Fox

20  and the Big 10?

21          MR. SINGER:  Well, I think that none of the

22  agreements are relevant, and I don't think there's a need

23  for any of them, and I think that should be the ruling

24  across the board.  Now, the fact that ESPN and CBS have

25  struck deals, maybe they didn't want to get in front of your

30

1   Honor and take the chance.  Maybe ESPN's financial terms
2   have been leaked and they're not as concerned as Fox.  Maybe
3   ESPN's deal is up much sooner than Fox so it's less of a
4   threat to them.  There could be all sorts of reasons why
5   they may not be as interested or concerned as us, but that
6   doesn't change the fact that we have a standard to apply.
7   We need to address relevance.  We need to address need, and
8   if that happens to be -- if they -- if they made a deal too
9   soon, there's no reason why the -- the Court's desire to
10  reward parties for working things out in discovery should
11  prejudice Fox, a nonparty, who's asking only that the
12  correct legal standard be applied, and there -- it would be
13  more perverse for the Court to punish Fox for applying the
14  correct legal standard and being correct than to, you know,
15  have there be a negative consequence of the other networks
16  making a deal prematurely.  It's not outrageous for a party
17  in our position where we think this is -- this is not even a
18  close call from our position for us to stand on our ground
19  and assert our right, and we shouldn't be prejudiced because
20  other parties, for all sorts of reasons, may have decided
21  let's cut a deal.
22          THE COURT:  Thanks very much.
23          MR. SINGER:  Okay.
24          THE COURT:  Let me hear back from Plaintiff's
25  counsel.  Really I want to focus on -- I'll get back to you

1 here in a moment if I like -- yes?

2        MR. SINGER:  Your Honor, I don't want to -- I know

3 you have a lot of people who have a lot to say, but at a

4 later point I would like to speak about the need, because we

5 have talked about relevance and not need, which relates to

6 alternate sources for this information.  For example, we

7 talked about consumer demand and how important it is to know

8 consumer demand, and counsel mentioned the Board of Regents

9 case.  Well, the Board of Regents case was comparing --

10 talking about consumer demand to interest in football games

11 from small schools and big schools, and they figure the TV

12 rights agreements probably reflect that.  It didn't have to

13 do with minute changes in demand supposedly caused by

14 increase in scholarship.  It was not a discovery dispute.

15 There was no question about trade secrets, and there was no

16 -- the question of can you get this information from another

17 source didn't even come up.  And here there are literally

18 companies whose job is to measure consumer demand, like

19 Nielsen.  There are very easy ways to get and gauge consumer

20 demand without prying our confidential agreements and trade

21 secrets out of our hands and potentially putting them at

22 risk of greater exposure.

23        THE COURT:  All right.  Thank you very much.

24     Mr. Feher -- Mr. Cooper has something to say.  Go

25 ahead, Mr. Cooper.  What's your topic?

32

1        MR. COOPER:  All I was going to offer is to the
2   extent you're interested --
3        THE COURT:  Come forward so people on the phone
4   can hear you.
5        MR. COOPER:  Scott Cooper, your Honor, for Pac-12.
6        THE COURT:  Yeah.
7        MR. COOPER:  To the extent you have raised the
8   question of the other conferences' reactions to your ruling
9   with respect to the Big 10 --
10       THE COURT:  Well, I haven't ruled yet.  I'm
11   still --
12       MR. COOPER:  What I mean is whatever it is --
13       THE COURT:  Yeah.
14       MR. COOPER:  -- I am prepared to address that for
15   the other conferences in light of what we've negotiated and
16   what is yet to be dealt with for the Pac-12.  To the extent
17   you're interested in that reaction, we're happy to provide
18   it.
19       THE COURT:  Very good.  I'll come back in a moment
20   for that.
21     Mr. Feher, can you address the relevance of the media
22   agreements in particular?
23       MR. FEHER:  Yes, your Honor.  I think it's
24   actually a lot more straightforward than Mr. Rosenman said.
25   And, with all due respect, he conflated a whole bunch of

1   things in his presentation, and most importantly, he

2   conflated consumer demand with the financial arguments

3   because the inability to pay is on one hand, and the

4   consumer demand is an entirely separate argument and issue.

5   And, besides that, it's not just a reference to one thing in

6   an expert report.  We have three pages of references from

7   the Defendants' various justifications, and I'm going to --

8   I'm just going to read you one, okay, which I think is

9   dispositive of all of this.  It's the ACC's amended and

10  supplemental responses and objections to interrogatory

11  number five relating to pro competitive justifications.

12  It's basically the same thing in the other conference

13  Defendants' responses too.

14              "The challenged rules serve the pro

15          competitive goal of promoting consumer

16          demand in the college education market."

17      The question of consumer demand as a separate and

18  independent and principal defense by these conferences I

19  think is incontestable as anything can possibly be, and in

20  terms of that, you know, there was discussion about a

21  survey, okay, and it's nice.  We'll see whether we have

22  survey evidence.  We'll argue about the survey evidence, but

23  I think it's not fair, and it's wrong to say, oh, you can

24  have survey arguments and so, therefore, you should and can

25  be deprived of what may be incredibly powerful evidence with

34

1  respect to the money paid to these conferences passed

2  through to the teams.  Okay.  It's an ironic statement that

3  we're a pass-through entity.

4       And there was all this discussion of, "Oh, consumer

5  demand doesn't matter.  The only thing that matters is

6  what's distributed."  That's as illogical a statement as I

7  have heard in a long time in a court, okay.  It's

8  contradicted by the Supreme Court's statement in <u>Board of</u>

9  <u>Regents</u>.  Consumer demand is reflected by the money paid by

10 the networks for these rights.  They pay the money because

11 more consumers will watch at any given times.  They pay less

12 if less consumers are going to be watching it.  The dollar

13 amount paid for these media rights are incredibly important

14 ion terms of reflecting consumer demand.

15      The increasing growth of these media right payments on

16 an individual basis is very important to this case, and I

17 also don't want to get too distracted, although it is very

18 important, by just the media rights agreement because we

19 have sponsorship agreements that have been discussed and

20 have been at issue, and in terms of that, to the extent that

21 sponsors are renewing not on the basis of 15 or 20-year

22 contracts, which these networks have done for whatever

23 reason, but, you know, there's talk of these Form 990's that

24 are from eight years in the past.  Well, that's one story,

25 but the story as to how much money is going to come in in

35

the future is a completely different chapter that the --
that the Big 10 would deprive us from, and that's the
incredibly important indicator of evidence that we would not
otherwise have.

     The sponsorship agreements tell the same tale but on a
more granular level, and that will enable us, I believe, to
tell similarly powerful stories in terms of how sponsors
have signed up again and again on a continuing basis, even
though these athletes have received different forms of cost
of attendance reimbursements, however you want to phrase it,
this past year, which made a big change in terms of the
treatment of these rules.

     This is very important evidence.  I do not think that
relevance is a close question.  I cannot read the mind of
the conference Defendants.  I'm not going to make any
statement in terms of what anyone said or didn't say.  My
own belief is the reason we are here with four out of the
five conferences having agreed to this is because it's not a
close case, and these conferences would not have agreed to
this but for the just blatant obvious relevance of these
documents to these core issues.  This is -- the issue of
consumer demand is a core defense of the conference
Defendants, and these documents are directly relevant.

     There's one additional point I want to address, which
is Mr. Rosenman said, well, what's being offered is what was

36

1  being asked for.  Okay.  That's just not true.  Okay.  When

2  you compare what's in the letter agreements to what the

3  requests are in our original motion to compel, there is no

4  reference, for example, that financial analyses will only be

5  provided from the files of the commission.  Okay.  We gave

6  up on the CFO files for the Pac-12 in terms of financial

7  analyses.  That was a big give on our part because I fully

8  expect that there will be all sorts of interesting and

9  relevant financial analyses in the CFO's files that we're

10  not going to get under that agreement, okay.  But I'm going

11  to stick to that agreement.

12      There are all sorts of agreements on the marketing

13  documents which were very very important in terms of the

14  Pac-12.  We wanted all of their advertisements, okay.  The

15  agreement reflects the fact that we're just going to get

16  archived documents and what's represented to be a

17  representative sample of the archived documents, far less

18  than we wanted.

19      Okay.  In terms of websites and social media sites, if

20  we want those, we're going to have to pay for them, okay.

21  I'm not especially going to be happy about having to write

22  those checks, and, in all honestly, I'm going to have to

23  make cost benefit analyses as to whether or not I'm going to

24  seek some of those documents from the websites and social

25  media sites, and I would much rather not have been put in

1  that position, but I am by virtue of the compromise after

2  compromise after compromise reflected in these letter

3  agreements.

4      Your Honor, the decision is up to you.  I can't make

5  the judicial administration call.  I came here offering and

6  seeking what was given to the Pac-12.  I want to move

7  forward with this case and get to the merits and have the

8  merits presented in a full and fair way.  I don't like the

9  extra procedures that I'm going to have to jump through.  I

10 fear -- honestly, I fear the potential redactions when ESPN

11 in its brief said it will be subject to heavy redaction.

12 Okay.  Heavy redactions.

13     To be clear, okay, Plaintiffs care not just about the

14 dollar amount that's to be paid under those contracts.

15 That's very very important.  There's an additional issue as

16 to what are you buying for those dollar amounts because,

17 just to give one example, the Big 10, it doesn't have one

18 media contract, okay.  The one thing they have, the Big 10

19 network, which is, at least by public reports, 51 percent

20 owned by Fox, 49 percent owned by the Big 10 -- used to be

21 slightly different percentage.  Now it appears there's an

22 issue for our purposes as to whether we have control or not

23 control over their files.  We're going to have to address

24 that  if there is no control, then I may have to issue a

25 subpoena and deal with that, but that's one whole massive

38

1  revenue stream for the Big 10, okay.  And the bucket of

2  rights that are left to the Big 10 network is very important

3  because that's one revenue stream that's paying for one

4  bucket of rights.

5      There is a deal with ESPN that the Big 10 has for a

6  certain number of rights in football games that are

7  broadcast at various times.  What are they buying for that

8  dollar amount?  How many games?  What's the per game

9  average?  How does it change from year to year?  Those are

10 all important relevant questions in terms of testing

11 consumer demand.  That's besides the contract with Fox that

12 they've just entered into.  When you add it all up, there's

13 400 and some million dollars plus the Big 10 network.  It's

14 not enough to tell Plaintiffs, "Well, we gave you the bottom

15 line number of not even 400 and some million dollars but

16 whatever we distributed to the schools, by the way, after we

17 paid whatever exorbitant salaries went to these

18 administrators who've been, you know, riding very high for

19 these last few years."

20     It is troublesome, okay, that suggestions are being

21 made that we can defend this case on the basis of consumer

22 demand, and that's a principal defense, and we're going to

23 stand up here and say that as loudly as we can, that these

24 restrictions should be upheld because they preserve consumer

25 demand and yet tie Plaintiff's hands in terms of fundamental

1  evidence that is going to show, I firmly believe based on

2  public reports, based on what we've already seen from things

3  that are already in the record, that consumer demand is not

4  affected a wit by these restrictions.  Consumer demand is

5  affected by loyalty to school, by locales of these teams,

6  and other factors that have nothing to do with whether or

7  not the peanut butter that is on top of the bagel is or

8  isn't considered compensation or whatever benefits or in

9  kind remedies we end up discussing whenever we get to that

10  stage of the case.  And so this is not some side issue.

11  This is a critical issue.  This is a transaction by

12  transaction piece of criticality in terms of its relevance.

13  There are stories that will be told by this evidence that I

14  think you know from your trial practice makes all the

15  difference in the world in terms of changing minds and

16  people learning lessons as to what reality is.

17      We will not be buried, okay, in a dump of meaningless

18  numbers or not very meaningful numbers that when aggregated

19  over multiple years or that only look into the past or not

20  to mention something that I -- I used in the brief was a

21  little cynical and I was hazard to use words like that, but

22  the offer on projection, okay.  We'll give you one year of

23  projections, and, oh, by the way, not mention that that's

24  the year before the new TV contracts kick in with massive

25  increases.  Okay.  I hazard to say words like that, but it's

40

1  offering us not meaningless things but things that are worth

2  cents on the dollar to the documents at issue.  My hands are

3  already going to be tied enough by the negotiations we've

4  done, your Honor.  I respectfully submit that that should

5  not entitle any further.

6           THE COURT:  Thank you very much.

7      Mr. Cooper, you proffered that you might have something

8  to say for the Pac-12 and other conference.  And this is not

9  focused on the unresolved issue with the Pac-12 but to the

10 extent it bears on the Big 10 issues.

11          MR. COOPER:  Understood, your Honor.  And

12 obviously I reserve my ability to be able to argue about

13 relevance broadly speaking in the context of what's left of

14 our motion.

15     I just wanted to offer, in light of what you'd asked

16 Mr. Rosenman, that I can speak with real confidence for the

17 Pac-12, and I know the SEC, whose counsel is in the room,

18 and I suspect for the ACC and Big 12, that we -- we will not

19 be offended in any respect if the Court rules that the Big

20 10 produce fewer documents than we've agreed to.  We have

21 engaged in negotiations for our own reasons.  I would submit

22 that I probably, if I had it to do over, in light of last

23 week's hearing on the motion for judgment on the pleadings,

24 I would negotiate a different deal.  But I made a value

25 judgment and an economic judgment about, you know, keeping

41

1   to the path we had already taken and concluded a deal with

2   Mr. Feher.  But had I to do over and more time to do it, I'm

3   sure we would have taken a different path, and I can talk

4   about that in the context of the relevance of financial

5   documents.

6        But the Court, I think, should draw no conclusions from

7   what the rest of us have done for our own reasons based on

8   what the Big 10 went through.

9        With respect to Fox, I'd just note, as your Honor

10  probably noticed, that we've reserved the question of what

11  happens with our Fox agreement, and that's entirely to be

12  determined based on what your Honor does with respect to

13  that issue here.  So we've engaged in no agreement with

14  respect to that.

15           THE COURT:  Thanks so much.  I see counsel is

16  moving forward from the back of the courtroom.  Good

17  afternoon.

18           MR. EARNHARDT:  Thank you, your Honor.  Wes

19  Earnhardt from Cravath, Swaine and Moore, on behalf of ABC

20  and ESPN.  Just very briefly, your Honor, to follow on

21  something Mr. Cooper just said.  You know, the deal that --

22  that we've reached with four of the conferences and that we

23  made to all five wasn't an easy deal for us to swallow.  We

24  have real concerns and real questions about the relevance of

25  these agreements, and I can go into the detail of our

42

1   thoughts on that if you'd like, but more importantly for us,
2   they contain our trade secrets, and the reason that we were
3   willing to -- we've worked for many months to try to be
4   reasonable to resolve this.  The reason we did that is
5   because some trade secrets are more valuable than others,
6   and we wanted to take no risk, no risk that certain
7   provisions were disclosed.  And so, in order to avoid that,
8   we tried to reach a compromise that would allow even the --
9   the ones that are -- all the trade secrets to be protected.
10       And I raise this only because if the Court is inclined
11  to grant the motion to compel in part against the Big 10,
12  either for reasons of fairness or reasons of precedent or
13  any other reason, I would just like to remind the Court that
14  we have deals with the Big 10.  The Big 10 is the one
15  conference that has deals with all three of the networks.
16  We did work very hard to reach a reasonable compromise with
17  the Plaintiffs, and the fundamental point, the fundamental
18  building block of all of those deals that have been reached
19  is that there is a redaction protocol that allows us to
20  redact things that -- you know, that do not go to the points
21  that Plaintiffs have now raised here in court and in their
22  briefs as to why they think they are relevant and strengthen
23  the protective order that is in a form reasonably agreeable
24  to us, which prohibits people that have seen the deals in
25  the past from seeing them now and prevents people that see

1 them now from in the future negotiating against us in future

2 negotiations, and that has been fundamental to all the deals

3 that have been reached, and if there is going to be a motion

4 to compel granted against the Big 10 for whatever reason, we

5 would just ask that those protections be part of that motion

6 -- of that order.

7           MR. FEHER:  Your Honor, Plaintiffs have no

8 objection to that.

9           THE COURT:  All right.  Very well.  And that was

10 MR. Feher speaking.

11           MR. FEHER:  Yeah.

12           THE COURT:  Why don't you come --

13           MR. BUCHWEITZ:  Your Honor, Yehudah Buchweitz from

14 Liol Gotchal for CBS.  Just want to also make for the record

15 we have a similar position to ESPN.  We didn't have quite as

16 many agreements as the people in the room, but we have

17 agreements with some of the people who aren't in the room

18 yet, and we gather that this will impact later on, and it's

19 very important to us that there be a redaction protocol and

20 the enhanced protective order which, frankly, we agreed on

21 five months ago among ESPN, SEC, and us, way before the last

22 time we were all here, and I hope that we don't have to come

23 back too many more times, but if there's ever a, you know,

24 motion to compel ordering the production of any of CBS's

25 contracts, it has to be with those two things is our

44

1  position.

2      Thank you.

3          THE COURT:  All right.  Well, the Chamber of

4  Commerce appreciates your visits, the same as each time --

5  each time you come.

6      All right.  Mr. Rosenman, do you have any -- any

7  further things you'd like to say on the motion to compel as

8  to Big 10?

9          MR. ROSENMAN:  A couple of things, your Honor.

10  This case is not about broadcast agreements.  None of the

11  member schools of any conference are a party to those

12  agreements.  None of the Plaintiffs or the student athletes

13  are parties to those agreements.  And so the whole notion of

14  consumer demand is not directly relevant from those

15  agreements.

16      The compromised proposal that we've provided included

17  any provisions dealing with the issue of consumer demand as

18  part of that compromised proposal.  So, to the extent that

19  issue is discussed or concerned in any of the media

20  agreements, we agree to produce those provisions consistent

21  with how this Court treated this issue in Name, Image and

22  Likeness.  But the current posture of this case is much

23  different than it was when the Plaintiffs filed it because

24  in the interim you have the Ninth Circuit's decision in

25  O'Bannon.  And so now this -- the scope of the case has

1  changed, and certainly, as Mr. Cooper pointed out, Judge

2  Wilken last week acknowledged the fact and the transcript is

3  now part of the record, Judge Wilken acknowledged that the

4  Ninth Circuit's decision limits what the Plaintiffs can seek

5  about the cost of attendance.

6       We've tried to be reasonable.  What we've already

7  produced, what we've offered to produce and the less

8  intrusive methods, even if the agreements were relevant,

9  more than suffice for Plaintiff's purposes in this case.

10          THE COURT:  All right.  Mr. Feher, what's the

11 final words on this?

12          MR. FEHER:  Just very briefly.

13          THE COURT:  Yes.

14          MR. FEHER:  In terms of Judge Wilken's decision,

15 there's discussion about the remedies might eventually be

16 granted.  It doesn't say anything or change anything with

17 regard to the pro competitive defenses, which are clearly

18 stated as to consumer demand.

19      And just one small but very important thing which, as

20 Mr. Rosenman talked about, the offer with respect to the

21 contract, the problem was was that it omitted the most

22 important thing regarding consumer demand, which is price.

23 You can have all sorts of provisions.  Whether they happen

24 to mention or don't happen to mention consumer demand I

25 actually believe the fact that media rights contracts --

46

1  I've read an awful lot of them over the years in other

2  things I've done in my life, they're not likely to talk

3  about explicitly in their terms, you know, consumer demand

4  is X or Y.  That's not the job of a media contract.  But

5  when it says I'm going to pay you $250,000,000 a year, that

6  speaks a ton about consumer demand, and that's why these

7  documents are relevant.

8          THE COURT:  Thank you very much.

9      I am now going to rule.  I've heard from you, Mr.

10 Singer.  I'm going to rule.

11     I'm going to rule on the motion to compel as to the Big

12 10.  This is focused only on the Big 10 portion of the

13 motion to compel.  The part we've heard the Pac-12 through

14 Mr. Cooper we'll deal with in a separate argument in a

15 moment.  So this is not ruling on the Pac-12 part of the

16 motion to compel.

17     Now, I find that the Plaintiffs have established both

18 the relevance and need of the information that they seek

19 from the Big 10, and, therefore, I'm going to grant the

20 motion to compel as to the Big 10.

21     The relevance is -- as asserted by the Plaintiffs, is

22 to the defense of the pro competitive justifications

23 asserted in the case.  I'm cognizant of what the Ninth

24 Circuit said in the O'Bannon decision, and I've read the

25 transcript of the hearing before Judge Wilken as to what she

47

1   has said about that, and, of course, we're here in this

2   courtroom just focused on discovery and the probative of the

3   information to the defenses in the case.  We're not here

4   today deciding remedies or deciding what's admissible in the

5   case.  It's a process of whether there's information that is

6   probative of a defense in the case, and my decision and

7   finding is that the information sought from the Big 10 and

8   also sought from other conferences is relevant to defenses

9   asserted in the case, and though there's also a need for the

10  information that the Plaintiffs have established.

11      Looking at one of the analogies presented today by

12  counsel for the Big 10 -- and this goes to the centrality of

13  this information to the dispute -- the magnitude and dollar

14  figures asserted as to the media rights and sponsorship

15  rights and other dollar figures reflected in these documents

16  is central to the case.  It's an important part of the case.

17  The analogy was made to Sack State Hornets, and if this were

18  a discovery dispute seeking information from Sack State, I

19  might be persuaded to say, "Well, this is pretty -- kind of

20  a side issue and not very important to the resolution of the

21  competitive justification for things that occurred," but

22  it's not a motion as against Sack State or some smaller

23  school.  The Big 10 and the other conferences represented

24  are the biggest financial engines, and these media rights

25  and sponsorship rights are going to be a significant aspect

48

1   of that defense as it's asserted.

2        So I -- in weighing proportionality, which Rule 26 does

3   require, I have to look at the significance of the dispute

4   of the -- of the facts that are here necessarily speak to

5   the overall case, and here I find that there is a high

6   significance to these -- to this discovery that's being

7   sought.

8        And, yes, I have considered whether the information

9   could come from somewhere else, could it come from surveys

10  or could it be sought from the schools themselves or from

11  some other source, and it's true that there are other places

12  where you can find information, but I don't think that other

13  information is going to be more probative than -- than

14  what's being sought from the Big 10, and I think it's -- you

15  can't get the same information as effectively from somewhere

16  else.  So the information is closely guarded and, yes,

17  there's some leaks in some information publically.  I'm not

18  in a position to know if the publically available

19  information is correct or not, and that's why discovery of

20  the underlying documents is appropriate, because I don't

21  think there's a reliable public place where one can

22  substitute consumer demand or some -- some other way to find

23  out the dollar figures that are passing through to the

24  schools through these -- through the conferences.

25       So I am persuaded by the Plaintiff's brief and argument

49

here in court that the information sought is both relevant
to the defenses isn the case and also is needed.  There are
valid trade secret and confidentiality concerns asserted by
the Big 10 and the other conferences and by their network
partners, and I've considered that and the relevance and
need I'm balancing, and I find that the protective orders
that have been entered and can be modified if there are
particular pieces of information that need higher
protection, that stipulated protective orders are the proper
way to address that, and because we have examples of the
other four networks that have agreed to a -- excuse me --
other four conferences that have agreed to a process for
reviewing redactions and dealing with that issue, we do have
a template for how the victim might also deal with those
same -- and Fox Networks might deal with those same
particularly sensitive concerns.  So we have a template for
that, and I am ordering that the Big 10 will follow the same
process that we have so far -- has been agreed to between
the Pac-12 and the Plaintiffs and are still part of the Pac-
12 arrangement which we're going to discuss, but as far as
the over-arching template of having a process of review for
redactions and confidentiality, I'm ordering that the Big 10
will be bound by the same proposal that's been proposed in
the last submission to the Court of the compromise between
the Pac-12 and Plaintiff.

50

1       So I am interested and the Rules require that all

2  parties to a discovery dispute make reasonable compromises,

3  and I find that both the Big 10 and Plaintiffs have

4  considered reasonable compromises and have made good faith

5  positions to each other and negotiations.  So this is not a

6  case where I find that one party has stonewalled and has

7  refused to negotiate.  But I do -- having the benefit of the

8  other conferences having resolved this through their

9  compromise, I think that that process is a fair one to also

10 have the Big 10 follow.

11      And I do find and added to my finding that the

12 Plaintiffs have been reasonable, that they did make

13 reasonable compromises before the hearing as against the Big

14 10, and the fact that they didn't ask for more but could

15 have adds to the credibility of their request, and I

16 appreciate that you were not greedy in asking for more than

17 you have asked for because different counsel on a different

18 day might have taken the opportunity to ask for a punishment

19 rather than just fair terms.  So I appreciate, and I think

20 it is an equitable resolution between the -- and among the

21 different conferences to have each of them be treated

22 similarly, because they are maybe not identically situated,

23 they are similarly situated as far as the relevance of the

24 information that they possess.  So I think that all of them

25 possess relevant information, and it would be unfair to have

1   the Big 10 have a different result as far as the relevance

2   of its information.

3        Now, that still leaves some details yet to be worked

4   out, and -- for example, with the Pac-12, there's been a lot

5   of negotiation about particular custodians of information.

6   Of course, it's not going to be the same custodians who are

7   the Big 10.  So there's going to necessarily need to be

8   further conferring about what the comparable individuals and

9   terms would be, and I know you've already done some of that

10  negotiation because you've had some negotiation, but I do

11  think that some of those further details need to be worked

12  out between the parties.  So my -- the level of detail that

13  I'm ordering is the same deal that the Pac-12 is getting,

14  and I'm going to give you two weeks to work out those

15  details and either turn it into a further stipulation, as

16  you've been successful with the other conferences or, if you

17  can't resolve it, to give me proposed orders with your

18  competing proposals on resolving that.  But I think that two

19  weeks will give you that time to work it out.

20       The networks, including Fox Networks, of course, have

21  an interest, as stated here in court, and that will also

22  give them a chance to be engaged in the protective order

23  process so if there's some tweaking necessary to address

24  their particular contracts, that can be discussed as part of

25  that process.

1    I'm not ruling on, of course, today redactions of

2  particular documents, and the networks have spoken here

3  today about their particular concerns.  So I'm not -- I'm

4  not commenting one way or the other about how I'll deal with

5  those down the road, but you have heard my ruling as to the

6  relevance and need of the information, and the process of

7  redacting is not one that's going to prevent the discovery

8  of relevant information.  It's a way of protecting the

9  information.  It's not a way of preventing discovery.  And I

10 think that what's been agreed upon so far is a reasonable

11 way to address that process.

12    So that concludes my ruling on the portion of the

13 motion to compel granting the motion as to the Big 10.  I'm

14 going to take a five-minute break, and we'll come back and

15 talk about the Pac-12 portion of the dispute.  Thank you.

16    (Proceedings recessed briefly.)

17        THE COURT:  -- present.  Hopefully there's people

18 still on the phone, not double-billing while they listen to

19 the hearing, and return to the portion of the motion to

20 compel as to the Pac-12, and the issue presented in docket

21 473 is the Pac-12 and Plaintiffs have been unable to resolve

22 the issue of whether the Pac-12 should produce documents

23 constituting financial analyses related to intercollegiate

24 football or basketball with respect to potential contract

25 terms that were subsequently entered into in actual

53

1   contracts, which issue shall be decided by the Court.

2       And tell me what your positions are on the issue.

3           MR. BUCHWEITZ:  Your Honor, can I just have one

4   minute before?

5           THE COURT:  Is it on this?

6           MR. BUCHWEITZ:  Thirty seconds on -- on something

7   I tried to get in at the very end the last time.

8           THE COURT:  No.  You can have 30 seconds after

9   we're done with this issue.

10      All right.  So Plaintiff.

11          MR. FEHER:  If I may, your Honor, this is a very

12  very narrow issue, and it is bluntly, a temporal issue.  The

13  Pac-12 has otherwise agreed, as other conferences have

14  otherwise agreed, to produce financial analyses relating to

15  collegiate football or basketball.  Some of them have done

16  conferences as a whole, but that varies a little bit, number

17  one.  But the bottom line is is that there have been

18  agreements that financial analyses will be produced.  There

19  are different time periods and all that.  That's all

20  decided.

21      The issue here is not about -- it's about the

22  negotiation process.  So let's say you have a negotiation of

23  the contract and in the midst of the Pac-12 contract

24  negotiations, apart from everything else that goes on in the

25  negotiation, the financial analysis occurs in the course of

1 that negotiation.

2     This isn't about analyses of potential contract terms

3 that end up not being in the contract.  Okay.  If somebody

4 proposed that, you know, the Pac-12 received $60,000,000 a

5 year, they got 50, somebody ran a financial analysis at the

6 60, but they didn't get 60, they got 50, I don't need, you

7 know, what they ran on 60 because it was a figment of

8 somebody's imagination.  It was an ask.  It wasn't what

9 ended up happening.  So it's -- I don't need those.  It

10 might possibly reveal something, but it's not important

11 enough for me to fight about.

12     The only thing that is at issue here is a financial

13 analysis of something that ends up in the contract itself.

14 So if the contract itself says $50,000,000 a year is going

15 to be paid to the Pac-12 for whatever, you know, part of the

16 core, and if an analysis is done the day after the contract

17 is signed, there's no dispute we'd get.  That would be fine.

18 That's agreeable.

19     The issue is is that if it was done during the

20 negotiation process, even though it's a financial analysis

21 of $50,000,000, is there some reason we shouldn't get it.

22 Now, I understand that there may be issues of interpretation

23 and that people looking at a particular document may

24 struggle a little bit, is it a financial analysis or is it

25 like an analysis of a bargaining posture or something like

1  that.  To make this clear for purposes of administration,

2  this has always been a financial analysis.  So it has to be

3  an analysis of something involving dollar amounts.  And if

4  it doesn't involve dollar amounts, I'm not going to contend

5  that it's encompassed within this bucket, right.  And if

6  it's about something else, you know, if it's an analysis

7  that somebody's leveraged in the bargain, okay, that

8  wouldn't be, absent something else inside it, a financial

9  analysis.  It would be an analysis of something else.  It

10 might be covered by another request, depending upon what's

11 said, because if it's in bargaining and they talk about, you

12 know, amateurism or whatever it would be covered by, that's

13 a separate agreement.

14      But the bottom line is is the singular question here is

15 that if you have a financial analysis of something that

16 ended up in the contract, you know, that spreadsheet

17 analysis of the $50,000,000 that ended up in the contract,

18 could we afford it or couldn't we afford it?  Yeah, we

19 compared it.  It's -- you know, it's great.  This is what it

20 is.  These are the numbers.  This is the financial analysis.

21 That should be included in this.  There's no reason to

22 exclude it, and that's the sole issue.

23          THE COURT:  I don't know the answer to this

24 question, and I'll give Mr. Cooper a chance to, of course,

25 articulate his objection in a moment, but how would a person

1 going and seeking the financial analyses related to football

2 and basketball with regard to potential terms that ended up

3 in a contract, based on what you know, how are those

4 financial analyses organized and kept in -- pragmatically,

5 how would the person responding to that request go and find

6 those documents?

7         MR. FEHER:  If you're looking in the negotiation

8 files of a particular deal -- and my assumption based on my

9 own experience is people tend to organize their files on a

10 deal by deal basis or documents referencing, you know, that

11 even if it's maintained electronically in a E-mail file,

12 it's going to mention the counterpart on it, and so you'll

13 be able to segregate it out and tell if this is relating to

14 that negotiation.

15         THE COURT:  But how would you know it's related to

16 a term that got into an actual contract versus a contract

17 term that didn't make it in the contract?

18         MR. FEHER:  Actually, there's one important thing

19 here which is really really important.  This isn't about

20 looking through a whole bunch of people's files.  This is

21 looking through Larry Scott's files in the Pac-12.  It's a

22 very narrow subset of files, a very narrow subset of

23 documents.  Basically somebody's going to need -- and that's

24 -- one of the things we narrow down.  I mean, if it's

25 important enough to have gone to the commissioner of the

1  Pac-12, if there's a financial analysis of a deal term that

2  ends up in the contract itself, we're not going to be

3  dealing with that many documents.  It's not that burdensome.

4  And if somebody has to sit through Mr. Scott's files for a

5  few days, you know, comparing his E-mails versus the deal

6  terms that ended up in the deal, that's important where we

7  should fairly go.  That's the only issue.

8          THE COURT:  All right.  Thank you.

9      Mr. Cooper?

10          MR. COOPER:  Your Honor, this is a topic that

11  requires some context.  This is a case I believe of the

12  Plaintiffs just not being able to accept that they've got

13  enough, and this is an over-reach pure and simple, and I

14  think we need to address the whole concept separate from

15  consumer demand of the potential relevance of the financial

16  condition of a -- one of the conference Defendants in -- in

17  basic terms given the fact that Pay for Play is now out of

18  this case as clearly as it could be.  That was always the

19  premise for the financial condition being relevant.  Now, as

20  of last week, we know Pay for Play is not a potential

21  remedy, and that changes what is potentially relevant with

22  respect to the financial condition of the conferences.  We

23  didn't seek to renegotiate since last week everything else

24  we were producing, but we're producing from soup to nuts

25  everything that's conceivably relevant to the financial

58

1  condition of the conference, even though what was always

2  argued was the financial condition of its members and not

3  the conference itself, that is, the ability of member

4  schools to be able to pay salaries to student athletes.

5      So the conference's financial condition was always a

6  step removed from the arguable ground for relevance.  Now,

7  that ground is completely gone from the case.  We are

8  producing, nonetheless, a long list of financial documents.

9  In addition to the media rights agreements, which go to

10  revenues alone, there's financial information relating to

11  its carriage agreements for the Pac-12 Network, the

12  financial statements, the audited financial statements of

13  the Pac-12, its future financial projections, its 10 largest

14  sponsorship agreements, extensive documents related to the

15  marketing of college football and basketball and the Pac-12

16  itself, and certain very specific documents analyzing the

17  finances of the Pac-12 as a whole.

18      In addition, we are producing negotiation

19  communications in connection with most of those contracts,

20  but those negotiation documents are limited to the subjects

21  that previously were thought to be relevant, that is,

22  amateurism, the collegiate model, and potential compensation

23  to student athletes.  Those issues, I would submit to you,

24  are pretty clearly off the table at this point, and so we

25  are producing all of that.

1      What we're now arguing about is internal documents

2  which analyzing the context of a prospective contract, that

3  is, during the negotiations of a contract, the internal

4  financial analysis of its terms during negotiation.  We're

5  not arguing about whether the contract itself is going to

6  get produced.  If they've negotiated for the production of

7  the contract, it's already provided for in the agreement.

8      What we're talking about is an inherently internal

9  document which talks about the ongoing negotiations and the

10  potential impact of those negotiations and the thinking of

11  the conference while it's negotiating the contract.  There

12  isn't really any arguable relevance to that kind of

13  information.  It doesn't go to their actual financial

14  condition.  It doesn't go to any probative issue with

15  respect to some potential student benefit that might still

16  be part of this lawsuit.  It goes to the internal thinking

17  of the conference executives in the course of the

18  negotiation with the third party, which may themselves, by

19  the way, be confidential, that is, the bargaining over

20  confidential deal terms which become the subject of a

21  confidentiality agreement in the ultimate agreement.

22      The notion that they need this in order to discover

23  their case is just wrong-head.  It's over-reaching, and it's

24  not relevant to anything that's even arguably left in this

25  case as of now.

1           THE COURT:  Thank you.

2       I'll give you the final word on this one.

3           MR. FEHER:  Just very briefly, your Honor.  There

4 was a lot of discussion about O'Bannon and Judge Wilken's

5 decision.  We've already talked about this a little bit.  I

6 don't want to argue everything about what's in that

7 decision.  It says what it says, but what it was very clear

8 about was it was talking about remedies, and it was talking

9 about what O'Bannon said and what it didn't say, and it

10 didn't say and Judge Wilken was clear that benefits and in

11 kind matters with respect to students were still very much

12 left on the table and that O'Bannon had a limiting effect,

13 but it was as stated in O'Bannon.  And I don't want to

14 replow the ground as to exactly what was covered, but just

15 as an example, benefits or in kind measures provided to

16 students aren't free either, okay, and they cost money.  And

17 if there is an analysis as to whether, for example, the Pac-

18 12 can afford to give health insurance to students, to

19 athletes for the rest of their lives, okay, like at least,

20 you know, other schools, don't argue as to whether or not

21 we're -- what's exactly in the case, what's not in the case,

22 is it already permitted or are we going to get an injunction

23 that, you know, ensures that that can be done because the

24 NCAA seems to be bouncing back and forth over some of its

25 rules.  That's one possible benefit.  There are all sorts of

1  other possible benefits that are not cheap that we're going
2  to be arguing about.  And so this issue of can we afford to
3  pay is still very very much in the case.  We're going to be
4  arguing about it going forward.  Unless all the Defendants
5  say "We're going to drop all of our defenses about the
6  financial inability," then maybe we can have a different
7  conversation, but I expect they're reserving their position
8  on that for another day, this is all still relevant.  I'm
9  not over-reaching on this.  Honestly, this came up because,
10 you know, it's a final exception, and I couldn't logically
11 figure out why it should be excluded.  If we're getting all
12 of the other analyses and it's the exact same thing but it
13 happened to be created in the course of the negotiation, why
14 should we not get it?  Plus, I could imagine that financial
15 analyses created during negotiations might be the time it
16 would actually be done.  And so it seemed like that would be
17 the most likely, you know, instance where it might actually
18 be created.  So I didn't want to create a hole that would
19 otherwise exist.
20       THE COURT:  Very good.  Here's how I'm going to
21 rule on the motion to compel as to the Pac-12.  And, again,
22 this is just focused on the one remaining issue.  Many have
23 been resolved by stipulation.
24     I find that the information sought in this request is
25 at least arguably relevant to the defenses in their case,

1 but I'm going to deny the request because I find that there

2 are many other sources of likely information that can

3 provide this same category of information based on what the

4 Pac-12 has agreed to produce, the media agreements, the

5 contracts, negotiation documents, depositions and other

6 sources, interrogatories.  There's other ways I think to get

7 a targeted approach to this type of information if it is

8 relevant to a defense in the case, and I'm concerned about

9 the administrative process of finding and identifying and

10 the burden of going through that process for a category of

11 documents that I agree with Plaintiff's counsel that it

12 seems like it might be a hole in your request.  So I -- I

13 can see why you're asking for it.  But in the abstract,

14 without having a particular financial report that went to

15 the Commissioner or that you know comments and is tied to

16 one of the agreements, it seems speculative and abstract at

17 this level to say that I know that it's relevant and also

18 needed and important to the case where there are many other

19 documents that you are going to be getting through agreement

20 that I think should overlap with this request, so more of a

21 trying to draw a line on reasonableness and a concern for

22 the administrative ability of the Pac-12 to go through its

23 files and find categories as defined here is the reason I'm

24 denying the request rather than I'm finding that this type

25 of a document is per se irrelevant and has nothing to do

1  with the case.  I just think that there are other ways you

2  can discover this category of information in a clearer, more

3  precise way, and that's why I'm denying it.

4      Now, both as to this order and as to the parties --

5  that's the Big 10.  Of course, the parties may appeal and

6  object to Judge Wilken within days of the order.

7      Now, there was counsel for one of the networks that had

8  some one more -- one-minute presentation on one of the

9  issues.

10          MR. SINGER:  Maybe even 30 seconds, but I'll take

11  a minute.

12          THE COURT:  All right.

13          MR. BUCHWEITZ:  No, just very briefly, your Honor,

14  and thank you for the recognition and the protections.

15  Yehudah Buchweitz for CBS Corporation.

16      You granted the motion to compel the Big 10, and you

17  referenced the agreement with the Pac-12 which the

18  Plaintiffs proposed to the Big 10.  We were not party to

19  that agreement.  I've never even studied it in detail

20  because we don't have an agreement with the Pac-12.  The

21  only one that we have is the agreement with the SEC.  We

22  will engage with everybody over the next two weeks.  We'll

23  actually study the Pac-12 agreement, but because we weren't

24  part of it, we were only parts -- it was SEC's stipulation

25  -- we have to reserve our rights too.

1    THE COURT:  Well, it was filed in -- it was filed

2  in ECF.  And so you can -- so you can see it there.  It's

3  not a secret.  And my directive is that you -- if you have

4  an interest in how that gets resolved, that you engage with

5  the other parties in the next two weeks to address any

6  interest that your client has in the protective order.

7    MR. BUCHWEITZ:  And we fully intend to do too.

8    THE COURT:  Very good.

9    MR. BUCHWEITZ:  Thank you.

10    THE COURT:  Thank you very much.  Now, I've got

11  one other -- this is not with the networks but one other

12  administrative question.  At docket 463 there's a

13  stipulation submitted about confidentiality designations,

14  and this is between Plaintiff and a third party who's not

15  present.  And my question is it was submitted for Judge

16  Wilken's signature.  It's asking for a continuance of the

17  deadline for submitting confidentiality designations until

18  August 19th.  And my question is -- my thought is that I can

19  sign that stipulation and that those should come to me, but

20  since we're here I thought I'd invite you to tell me if you

21  disagree with that notion.

22    MR. SHIFTAN:  That's fine, your Honor.  This is

23  Ben Shiftan on behalf of the Plaintiff.  I actually thought

24  we did submit it for your signature.  That was probably an

25  oversight.  Yes, it's just asking for a little more time to

65

1   work out --

2          THE COURT:  All right.  It has her name on it, not

3   mine.  So I will -- with your permission, I will sign it.

4          MR. SHIFTAN:  Absolutely.

5          THE COURT:  All right.  Thank you very much.

6      Any other matters for any party to present to the Court

7   today?

8          MR. FEHER:  No, your Honor.

9          THE COURT:  All right.  Thanks very much.  Thanks

10  for those participating on the phone.  We're in recess.

11      (Proceedings adjourned at 3:42 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

66

## CERTIFICATE OF TRANSCRIBER

1

2

3      I certify that the foregoing is a true and correct

4  transcript, to the best of my ability, of the above pages of

5  the official electronic sound recording provided to me by

6  the U.S. District Court, Northern District of California, of

7  the proceedings taken on the date and time previously stated

8  in the above matter.

9      I further certify that I am neither counsel for,

10  related to, nor employed by any of the parties to the action

11  in which this hearing was taken; and, further, that I am not

12  financially nor otherwise interested in the outcome of the

13  action.

14

15

16          Echo Reporting, Inc., Transcriber

17            Monday, August 15, 2016

18

19

20

21

22

23

24

25