IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: NATIONAL COLLEGIATE ATHLETIC ASSOCIATION ATHLETIC GRANT-IN-AID CAP ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | Case Nos. 14-md-02541-CW<br>14-cv-02758-CW<br><br>ORDER ON MOTIONS TO EXCLUDE PROPOSED EXPERT TESTIMONY<br><br>(Dkt. Nos. 704, 807, 809-52) |

Now pending are Plaintiffs' motions to exclude the proposed testimony of Dr. James J. Heckman and Dr. Kenneth G. Elzinga, and Defendants' motions to exclude portions of the proposed testimony of Dr. Daniel A. Rascher, Dr. Roger G. Noll and Dr. Edward P. Lazear. For the following reasons, the Court grants Plaintiffs' motion to exclude the opinions of Dr. Elzinga. The Court grants in part and denies in part Plaintiffs' motion to exclude the opinions of Dr. Heckman. The Court denies without prejudice Defendants' motion to exclude portions of the opinions of Drs. Rascher, Noll and Lazear.

BACKGROUND

Plaintiffs are current and former student-athletes in the sports of men's Division I Football Bowl Subdivision (FBS) football and men's and women's Division I basketball. Defendants are the NCAA and eleven conferences that participated, during the relevant period, in FBS football and in men's and women's Division I basketball. Plaintiffs allege that Defendants violated federal antitrust law by conspiring to impose an artificial ceiling on the scholarships and benefits that student-

athletes may receive in return for their elite athletic services. See 15 U.S.C. § 1. All claims for damages having settled, only claims for injunctive relief remain in this multidistrict litigation.

On March 28, 2018, this Court granted in part and denied in part the parties' cross-motions for summary judgment, in an order that provided additional background. In re: NCAA Athletic Grant-in-Aid Cap Antitrust Litig., Nos. 14-md-02541-CW, 14-cv-02758-CW, 2018 WL 1524005 (N.D. Cal. Mar. 28, 2018). The Court held that Plaintiffs had met their initial burden under a rule of reason analysis to show that Defendants' challenged restraints are agreements that produce significant anticompetitive effects affecting interstate commerce, within the same relevant market defined by this Court in O'Bannon v. NCAA, 7 F. Supp. 3d 955, 962-63 (N.D. Cal. 2014), and affirmed by the Ninth Circuit in O'Bannon v. NCAA, 802 F.3d 1049, 1079 (9th Cir. 2015).

The Court denied the parties' summary judgment motions as to whether Defendants had met their burden to prove that the challenged restraints serve the asserted procompetitive purposes of integrating academics with athletics and preserving the popularity of the NCAA's product by promoting its current understanding of amateurism, as they did in O'Bannon. 802 F.3d at 1073 (quoting 7 F. Supp. 3d at 1005). The Court granted Plaintiffs' motion for summary judgment on Defendants' other proffered procompetitive justifications. The Court denied Defendants' motion for summary judgment on whether two proposed less restrictive alternatives advanced by Plaintiffs would achieve any of Defendants' legitimate objectives in a

2

substantially less restrictive manner.  The Court scheduled a bench trial on the questions of procompetitive justifications and less restrictive alternatives.

LEGAL STANDARD

Under the Federal Rules of Evidence, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589 (1993).

Rule 702 permits an expert to offer opinion testimony on a subject if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In evaluating whether an expert's opinion testimony will help the trier of fact to understand the evidence or determine a fact in issue, the Court considers whether the testimony fits the facts of the case and is "relevant to the task at hand." See Daubert, 509 U.S. at 591, 597.  In assessing the relevance or "fit" of expert testimony, "scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." Id. at 591.

To evaluate the reliability of expert opinion testimony, a court must consider the factors set out in Daubert, which include

"whether the theory or technique in question can be (and has been) tested, whether it has been subjected to peer review and publication, its known or potential error rate and the existence and maintenance of standards controlling its operation, and whether it has attracted widespread acceptance within a relevant scientific community."  509 U.S. at 593-94.  "One very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying."  Daubert v. Merrell Dow Pharm., Inc., 43 F.3d 1311, 1317 (9th Cir. 1995) (on remand).  The "test of reliability is 'flexible,' and Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case."  Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999).  The focus "must be solely on principles and methodology, not on the conclusions that they generate."  Daubert, 509 U.S. at 595.

## DISCUSSION

I. Dr. Elzinga

Plaintiffs move to exclude the opinions of Dr. Elzinga regarding the definition of the relevant antitrust market in this matter and Defendants' power within that market.  Following this Court's March 28, 2018 summary judgment ruling, the only remaining questions for trial are: (1) whether Defendants have come forward with evidence supporting the two claimed procompetitive effects of the challenged restraints, and (2) whether Plaintiffs can show that any legitimate objectives

4

could be achieved in a substantially less restrictive manner. Defendants do not contend that Dr. Elzinga's testimony is relevant to the availability of less restrictive alternatives.

Dr. Elzinga was asked by defense counsel "to assess whether the economic evidence is consistent with Plaintiffs' monopsony-cartel hypothesis or whether the economic evidence is consistent with an efficient market explanation." Mar. 21, 2017 Elzinga Rpt. at 5. He concluded that the "relevant market in this case is a multi-sided market for college education in the United States" in which colleges operate as multi-sided platforms that balance their pricing to different constituents in the same way that a magazine must balance its pricing to subscribers and advertisers. Id. at 26. However, in the summary judgment order, the Court adopted the single-sided market definition from O'Bannon, the market for a college education combined with athletics or alternatively the market for the student-athletes' athletic services. Dr. Elzinga's reports and opinions, therefore, address an issue that is not part of this case. Defendants have conceded that both sides' Daubert motions would be moot to the extent that the Court granted summary judgment on any given issue.

Defendants argue that in addition to opining on the definition of the relevant market, Dr. Elzinga reached a "distinct conclusion that the NCAA's amateurism rules are procompetitive," which "does not turn on the adoption of his multi-sided market." Defs. Opp. at 44 n.25 (citing Mar. 21, 2017 Elzinga Rpt. at 7-8); see also Jan. 16, 2018 Hearing Tr. at 74-77. Plaintiffs respond that any proposed testimony by Dr.

5

1 Elzinga on the issue of procompetitive justifications is
2 dependent on his foreclosed opinions on market definition.  The
3 Court agrees.  Any testimony Dr. Elzinga gives regarding
4 procompetitive benefits in his hypothetical multi-sided market is
5 not relevant to procompetitive effects in the relevant market.
6 Daubert, 509 U.S. at 591.

Defendants contend that Dr. Elzinga also opines that "the NCAA's financial aid rules provide a mechanism for avoiding an inefficient market failure, born of the incentive to free ride on the benefits of amateurism."  Mar. 21, 2017 Elzinga Rpt. at 100.  Therefore, he states, "The rules limiting play to schools that only allow eligible players on their teams is [sic] merely implementing the efficient solution, in which case the rules are not anticompetitive, they are procompetitive."  Id.  Dr. Elzinga assumes that there is a procompetitive benefit to compensation restrictions and opines that the NCAA rules are necessary to prevent some schools from obtaining those purported benefits without themselves implementing the necessary restrictions.  This opinion does not provide any support for Defendants' argument that the NCAA's current rules restricting student-athlete compensation preserve the popularity of the NCAA's product by promoting its current understanding of amateurism.  Defendants do not contend that it supports their argument regarding the integration of academics and athletics.

Instead, this argument relates to an issue separate from the procompetitive justifications to be tried, namely, that college athletics requires that certain uniform rules be followed if its product is to be available.  NCAA v. Board of Regents of

University of Oklahoma, 468 U.S. 85, 101 (1984). This is why a rule of reason analysis is applied rather than a per se rule of illegality. O'Bannon, 802 F.3d at 1062. The questions for trial, however, are not addressed by Dr. Elzinga: whether the current, challenged rules have the two procompetitive benefits remaining at issue in this case, and whether less restrictive alternatives to those rules exist.

Dr. Elzinga's opinions are not relevant to any of the issues remaining for trial and will not assist the Court. The Court grants the motion to exclude his proposed testimony.

II. Dr. Heckman

Plaintiffs move to exclude the testimony of Dr. Heckman, who was asked to evaluate human capital and economic outcomes for student-athletes as compared to comparable individuals who did not engage in collegiate athletics. He concluded that there are substantial benefits to athletics participation. Mar. 21, 2017 Heckman Rpt. at 4-7. Defendants seek to offer Dr. Heckman's testimony on the topic of the procompetitive effects of the challenged restraints. Jan. 16, 2018 Hearing Tr. at 76-77.

Plaintiffs move to exclude Dr. Heckman's testimony for three reasons. First, they argue that, like his testimony in O'Bannon, it does not suggest that student-athletes benefit specifically from the challenged restrictions, and therefore it is not relevant to this case. 7 F. Supp. 3d at 980. Defendants respond that the disputed issue is not whether college has benefits, but whether student-athletes in particular share in those benefits or whether, instead, Defendants subordinate student-athletes' academic well-being to Defendants' financial gain. This issue is

7

relevant, and the weight of Dr. Heckman's testimony on it is a factual question for trial.

Second, Plaintiffs contend that Dr. Heckman's econometric analysis is not reliable because he does not control for scholarship amounts, he is unable to ascertain which members of the data sets are Division I basketball or FBS football players and he uses data sets that are so old that no class member appears in them. Dr. Heckman's data was drawn from surveys conducted by the United States Department of Education in 1988 and 2002. Plaintiffs have not identified any better data sets on which Dr. Heckman could have relied. Their criticisms of Dr. Heckman's data and methodology relate to the weight of the evidence, not its admissibility.

Finally, Plaintiffs move to exclude two categories of opinions in Dr. Heckman's June 21, 2017 reply report that they contend were not adequately disclosed in his opening report and are unreliable speculation.[1] Dr. Heckman's reply report responds to the May 16, 2017 report of Dr. Noll. Dr. Noll's report, in turn, was submitted in rebuttal to the March 21, 2017 reports of Drs. Elzinga and Heckman.

Plaintiffs' first objection is to Dr. Heckman's conclusion that Dr. Noll does not establish a college labor market monopsony or monopsony effects in such a market. Like Dr. Elzinga's proposed testimony, this conclusion is no longer relevant due to this Court's summary adjudication of the issues of market

---

[1] Dr. Heckman's June 21, 2017 reply report is titled "Rebuttal Report of Professor James J. Heckman." To avoid confusion with the rebuttal reports submitted on May 16, 2017, however, the Court refers to it as a reply report.

8

definition and the anticompetitive effects in the relevant market.  Accordingly, the Court grants Plaintiffs' motion to exclude Dr. Heckman's testimony on this topic.

Plaintiffs also move to exclude Dr. Heckman's testimony that Dr. Noll ignores the equilibrium effects of Plaintiffs' proposed rule changes, including adverse effects for some or all class members.  Dr. Heckman opines that Dr. Noll erroneously assumes that Plaintiffs' proposed rule changes would not result in other, detrimental changes to aspects of the student-athletes' relationship with the college, such as a loss of mentoring and coaching.  This testimony remains sufficiently relevant to Defendants' proffered procompetitive justification that the NCAA's current rules promote the integration of academics and athletics to survive the "fit" prong of the Daubert inquiry.  Moreover, it is sufficiently responsive to Dr. Noll's opinions.  The Court denies the motion to exclude this proposed testimony.

III. Drs. Rascher, Noll and Lazear

Defendants move to exclude the testimony of Plaintiffs' economics experts Drs. Rascher, Noll and Lazear on three grounds.  First, Defendants argue that the testimony of all three of these experts does not "fit" the facts of this case because it would, they say, "contradict the Ninth Circuit's clear holding that the NCAA's financial aid rules serve the procompetitive purposes of integrating academics with athletics and promoting amateurism."  Mot. at 54.  This argument merely duplicates Defendants' summary judgment motion, which was denied in relevant part.  The Court therefore denies it for the reasons explained in the March 28, 2018 order.

Second, Defendants argue that neither Dr. Lazear nor Dr. Noll is a qualified expert in college athletics or the laws and NCAA rules that govern them and that their opinions on those topics should be excluded. Defendants' focus here is not on any opinion set forth in the experts' reports, but on two portions of deposition testimony elicited by Defendants. Dr. Lazear testified to his understanding that antitrust law reflects an unambiguous societal judgment that when prices or quantities are restricted, the social cost outweighs the social benefit. Lazear Depo. at 176:20-178:24. Dr. Noll testified that that student-athletes' cost of attendance is calculated using the federal guidelines, which were not specifically designed as guidelines for athletic scholarships. Noll Depo. at 90:11-22. Plaintiffs respond that they will not offer expert testimony on legal conclusions. They contend, however, that the Court should withhold any ruling until trial, when specific objections can be addressed in context. Especially because this will be a non-jury trial, the Court denies Defendants' motion to exclude this testimony without prejudice to objection at trial, if necessary.

Third, Defendants contend that the opinions of Drs. Rascher and Lazear are unsupported by econometric or other analysis reflecting a generally accepted methodology. This includes their opinions that spending on coaches, administrators and facilities is currently inflated (supra-competitive) and that, absent the challenged rules, such spending would be reduced and redirected to student-athletes as cash compensation. Dr. Rascher compared colleges' spending on coaching and facilities with that of professional sports teams. He did not compare increases in

10

colleges' spending on athletic facilities with their spending on other facilities. Dr. Lazear admitted that he had not done empirical analysis that there is an overuse of capital or under-utilization of labor in the relevant market, but testified that he had looked at data associated with this market, such as data on the payment of coaches and the building and use of facilities. These objections go to the weight of the evidence at trial, not to its admissibility. The Court denies the motion to exclude the proposed testimony of Plaintiffs' experts.

## CONCLUSION

For the reasons set forth above, the Court GRANTS Plaintiffs' motion to exclude the proposed testimony of Dr. Elzinga (Docket No. 807 in Case No. 14-md-02541 and Docket No. 376 in Case No. 14-cv-02758). The Court GRANTS IN PART AND DENIES IN PART Plaintiffs' motion to exclude the proposed testimony of Dr. Heckman (Docket No. 809-52 in Case No. 14-md-02541 and Docket No. 374-52 in Case No. 14-cv-02758). The Court DENIES WITHOUT PREJUDICE Defendants' motion to exclude portions of the proposed testimony of Drs. Rascher, Noll and Lazear (Docket No. 704 in Case No. 14-md-02541 and Docket No. 327 in Case No. 14-cv-02758).

IT IS SO ORDERED.

Dated: April 25, 2018

CLAUDIA WILKEN
United States District Judge